UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| -v- | S1 21-CR-92 (JPO) |
| ULADZIMIR DANSKOI and JULIA GREENBERG, | OPINION AND ORDER |
| Defendants. | |

J. PAUL OETKEN, District Judge:

Defendants Uladzimir Danskoi and Julia Greenberg, along with four other individuals, were charged with one count of conspiracy to defraud the United States and to commit immigration fraud.  Following a jury trial in December 2022, Danskoi and Greenberg were convicted.  Danskoi and Greenberg each move for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, or in the alternative, for a new trial pursuant to Federal Rule of Criminal Procedure 33.  For the reasons that follow, both Defendants' motions are denied.

## I.    Background

The Court presumes familiarity with the background of this case and with the legal issues addressed in Judge Alison J. Nathan's opinion denying Greenberg's motion to dismiss the indictment; sever her trial; suppress her post-arrest statement; and produce minutes of the grand jury proceedings.[1]  (ECF No. 139.)

---

[1] This case was reassigned to the undersigned on March 30, 2022.  (ECF No. 143.)

On February 11, 2021, a grand jury returned a superseding indictment charging Danskoi, Greenberg, and four other individuals[2] with one count of conspiracy to defraud the United States and to commit immigration fraud.  (ECF No. 12.)  The charged conspiracy had three objectives:

(1) to defraud the United States and one of its agencies, United States Citizenship and Immigration Services (USCIS), in violation of 18 U.S.C. § 371;

(2) to commit immigration fraud by obtaining an immigrant or nonimmigrant visa, such as an L-1 visa, or a Form I-94, which is a document prescribed by statute or regulation which provides evidence of authorized stay and employment in the United States, in violation of 18 U.S.C. § 1546(a), paragraph 1; and

(3) to commit immigration fraud by swearing to material false statements in applications, affidavits, and other documents required by the immigration laws and regulations prescribed thereunder, and knowingly presenting any such application, affidavit, or other document which contains any such false statement, in violation of 18 U.S.C. § 1546(a), paragraph 4.

(ECF No. 187 ("Jury Charge") at 29.)

Trial against Danskoi and Greenberg began on December 5, 2022.  The Government's case relied heavily on a confidential source, referred to as CS-3, and a cooperator, referred to as CS-1, each of whom testified at trial.  The Government alleged that Danskoi, as head of the Brooklyn office of Russian America, guided CS-3 into applying for asylum based on his status as a gay man who faced prior and future persecution in Ukraine due to his sexual orientation — despite knowing that CS-3 was not gay.  It alleged that co-conspirator Yury Mosha, head of Russian America's Manhattan office, guided CS-1 into applying for asylum based on his political opinions — despite knowing that his basis for doing so was fraudulent.  Specifically, CS-1's application for asylum stated that CS-1 was the author of a blog that was critical of the Ukrainian

---

[2] Those individuals are Yury Mosha, Aleksei Kmit, Tymur Shcherbyna, and Kateryna Lysyuchenko.  Mosha entered a guilty plea on October 31, 2022.  Kmit entered into a deferred prosecution agreement on November 21, 2022.  Scherbyna and Lysyuchenko have yet to appear on the charges.

government, but the blog was in fact ghostwritten by Shcherbyna.  His application also recounted incidents of verbal and physical harassment in Ukraine based on his status as a Russian-speaking Ukrainian.  The Government further alleged that Mosha and Danskoi respectively referred CS-1 and CS-3 to Greenberg, who then coached them as they pursued fraudulent asylum claims before USCIS asylum officers and, in the case of CS-1, before a federal immigration judge.

Trial concluded on December 19, 2022, when the jury returned a unanimous guilty verdict as to both Defendants.  The verdict was recorded using a general verdict form, which does not indicate which objects of the conspiracy the jury unanimously agreed upon.  (ECF No. 194.) Danskoi and Greenberg have both moved for judgment of acquittal pursuant to Rule 29, or in the alternative, a new trial pursuant to Rule 33.

## II.    Legal Standard

### A.    Rule 29

A motion for judgment of acquittal under Rule 29 may be granted only if "no rational trier of fact could find guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 317 (1979).  In other words, a judgment of acquittal is warranted "only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Jiau*, 734 F.3d 147, 152 (2d Cir. 2013) (quoting *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004)).  In considering a Rule 29 motion, the Court must "view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017) (citation omitted).  The Court must also defer to the jury's resolution of conflicting witness testimony.  *See United States v. Glenn*, 312 F.3d 58, 64 (2d Cir. 2002).

A defendant challenging a jury's guilty verdict "faces a heavy burden." *Id.* at 63.  The

Second Circuit has emphasized that this deferential standard of review is "especially important

when reviewing a conviction of conspiracy . . . because a conspiracy by its very nature is a

secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in

court with the precision of a surgeon's scalpel." *United States v. Pauling*, 924 F.3d 649, 656 (2d

Cir. 2019) (quoting *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir. 1992)).

While a jury's verdict may be based on circumstantial evidence, "a conviction based on

speculation and surmise alone cannot stand." *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d

Cir. 1994) (citations omitted).  The Government must therefore "introduce sufficient evidence to

allow the jury to reasonably infer that each essential element of the crime charged has been

proven beyond a reasonable doubt." *Id.* (citing *Jackson*, 443 U.S. at 319).  To that end, the

Government "must do more than introduce evidence at least as consistent with innocence as with

guilt." *D'Amato*, 39 F.3d at 1256 (citation and quotation marks omitted).

**B.     Rule 33**

Under Federal Rule of Criminal Procedure 33, "[u]pon a defendant's motion, the court

may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R.

Crim. P. 33(a).  "[B]efore ordering a new trial pursuant to Rule 33, a district court must find that

there is a real concern that an innocent person may have been convicted." *United States v.

McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (internal quotation marks omitted).  "The test is

whether it would be a manifest injustice to let the guilty verdict stand." *United States v. Sanchez*,

969 F.2d 1409, 1414 (2d Cir. 1992) (internal quotation marks omitted).  The Second Circuit has

cautioned that "[Rule 33] motions are granted only in 'extraordinary circumstances,' and are

committed to the trial court's discretion." *McCourty*, 562 F.3d at 475 (citing *United States v.

Torres*, 128 F.3d 38, 48 (2d Cir. 1997)).  Because courts "generally must defer to the jury's

resolution of conflicting evidence and assessment of witness credibility"; only in "exceptional circumstances" may the court "intrude upon the jury function of credibility assessment." *McCourty*, 562 F.3d at 476 (citation omitted).

## III.    Discussion

### A.    Rule 29

#### 1.    Greenberg

Greenberg argues that a judgment of acquittal is warranted because no rational jury could have found beyond a reasonable doubt that she had the requisite knowledge or intent to join the conspiracy or made any agreement to further the objectives of the conspiracy. She raises two key subsidiary arguments: First, she argues that the Government failed to prove that she "knowingly presented" CS-1's and CS-3's fraudulent asylum applications as required by 18 U.S.C. § 1546(a), paragraph 4 (third object of the conspiracy). Second, she argues that she could not have acted with intent to commit immigration fraud because she truly believed that CS-3 was gay and that CS-1 was a political dissident. At a minimum, Greenberg argues that the evidence lends equal or nearly equal circumstantial support to a theory of innocence as it does a theory of guilt. Greenberg's arguments are unavailing.

Sustaining Greenberg's conviction requires a showing of guilt beyond a reasonable doubt as to just one of the three objects of the conspiracy. *See United States v. Duncan*, 42 F.3d 97, 105 (2d Cir. 1994) ("[W]hen a defendant is convicted of a multiple object conspiracy by a general verdict, the conviction is sustainable if one of the conspiratorial objects is supported by the evidence, even if the other is not.") (citation omitted).

Greenberg's first argument relates to the third object of the conspiracy. As a threshold matter, a charge of conspiracy to commit immigration fraud against the United States requires a showing of "(a) an agreement between two or more persons to commit immigration fraud and (b)

5

an overt act by at least one of the participants in furtherance of that agreement." *United States v. Archer*, 671 F.3d 149, 154 n.1 (2d Cir. 2011) (citing 18 U.S.C. § 371).  The conduct elements of immigration fraud under 18 U.S.C. § 1546(a), paragraph 4, are that the defendant (1) knowingly (2) presented (3) an application or document required by the immigration laws (4) that contained a false statement (5) as to a material fact.  *Id.* at 154 (citing 18 U.S.C. § 1546(a)).  According to Greenberg, the evidence at trial showed that she could not agree to 'knowingly present' CS-1 and CS-3's fraudulent documents because each asylum application was filed with USCIS before she was retained.  She emphasizes that Mosha and Danskoi had each tried to dissuade CS-1 and CS-3 from hiring an attorney at all, undermining the existence of a conspiracy involving her, a lawyer.

But even if the Court were to conclude that the Government's showing as to the third object was lacking — the Government's primary evidence of agreement is Greenberg having "completed and bolstered" CS-3's asylum application by providing USCIS with articles documenting the persecution of LGBTQ people in Ukraine (ECF No. 246 at 33) — the evidence was sufficient to allow a rational jury to find Greenberg guilty beyond a reasonable doubt on the first object, conspiracy to defraud the United States and USCIS (sometimes referred to as a "*Klein* conspiracy").

Proof of the first object requires a showing of the following elements: "(1) that [the] defendant entered into an agreement (2) to obstruct a lawful function of the government (3) by deceitful or dishonest means and (4) at least one overt act in furtherance of the conspiracy." *United States v. Atilla*, 966 F.3d 118, 130 (2d Cir. 2020) (citing *United States v. Ballistrea*, 101 F.3d 827, 832 (2d Cir. 1996)).  The existence of an overt act is uncontested.  On the first element, agreement, a rational jury could find evidence beyond a reasonable doubt that an

agreement existed among Mosha, Danskoi, Greenberg, and the other co-defendants.  The

Government presented ample evidence of this element, including messages and phone calls

between Mosha and Danskoi alluding to their work filing fraudulent asylum applications;

messages between Mosha and Danskoi that reference working with Greenberg (GX 581-20-T);

evidence of a multi-year working relationship between Mosha and Greenberg; and Greenberg's

post-arrest statement, in which she described Mosha as a "moshenik" ("fraud"), a translation that

Greenberg has not contested.

On the second and third elements, which implicate Greenberg's specific intent, a rational

jury could also find beyond a reasonable doubt that Greenberg knowingly entered into an

agreement with her co-defendants with the intent of obstructing the lawful function of the federal

asylum process through deceitful means.  This issue merges into Greenberg's second argument

— that the Government failed to prove specific intent because the evidence demonstrated her

genuine belief that CS-1 and CS-3 had valid bases for their asylum claims.  Specifically,

Greenberg's primary arguments are that: (1) CS-3 never explicitly told Greenberg that he was

not gay (Trial Transcript ("Tr.") at 328); (2) Greenberg's decision to overlook purportedly minor

inconsistencies in CS-3's asylum application is not evidence of her actual knowledge; (3)

Greenberg's encouraging CS-3 to dress more like a stereotypical gay man for his asylum

interview was not evidence of actual knowledge; (4) her post-arrest statement that she "knew"

CS-3 was not gay was not an admission of actual knowledge; and (5) while CS-1 stated that his

blog was ghostwritten by someone else, she truly believed him to be a dissident because the blog

was publicly associated with him and because he did not disclaim other parts of his asylum affidavit.[3]

The crux of this issue is whether any rational jury could credit the Government's interpretation of this evidence over Greenberg's innocent justifications.  At this stage, the Court is obligated to interpret the evidence in the light most favorable to the Government and draw inferences in the Government's favor.  Greenberg presented her interpretation of this evidence when she testified, and the Court must now defer to the jury's assessment of her credibility as a witness.  The jury rejected Greenberg's innocent explanations for the aforementioned conduct. While a different rational jury could have determined that Greenberg's theories created reasonable doubt, it is not the case that *no* rational jury could have credited the Government's interpretation of events.  "The government's case need not exclude every possible hypothesis of innocence . . . . "  *United States v. Martinez*, 54 F.3d 1040, 1042 – 43 (2d Cir.1995) (internal quotation marks omitted).  In situations where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter."  *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (internal quotation marks omitted); *see also*

---

[3] For example, Greenberg's trial counsel had the following exchange with CS-1 during his cross-examination:

> Question: You don't say that the underlying events are false, you just say that you had to rewrite the story five times and you had to add to it, right?
>
> Answer: Well, you need to look at the context.
>
> Question: I'm looking at the context. We just read through it. Do you say to her the stories are false?
>
> Answer: No.

(Tr. at 710.)

*United States v. Rosa*, 17 F.3d 1531, 1542 (2d Cir. 1994 ("The fact that a trier of fact has declined to draw one of two or more competing inferences does not mean that the inferences drawn were not available or were not reasonable."). Additionally, "courts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003). In this case, the jury did not find Greenberg's assertions that she genuinely believed CS-1 and CS-3 to have legitimate bases for asylum to be credible.

Taking the evidence as a whole, a rational jury could find evidence of Greenberg's specific intent beyond a reasonable doubt. While CS-3 testified that he never explicitly told Greenberg that he was not gay, the Government presented circumstantial evidence supporting a theory that Greenberg understood the basis of his asylum claim to be a sham. This includes evidence that CS-3 informed her that Danskoi "created" his story and that he memorized it after the fact (Tr. at 230); that CS-3 told Greenberg he was "going at it as a gay" because it was "the best way" to obtain asylum (Tr. at 232:7-25); that she coached CS-3 on how to appear more stereotypically gay (Tr. at 234); and that she was aware that CS-3 was not fully apprised of the contents of his asylum application because employees of Russian America had written it on his behalf (Tr. at 247:13-25; 248:1-9). Greenberg also admitted to knowing that CS-1's blog was ghostwritten and that therefore a major basis for his asylum claim was fraudulent. CS-1 testified that while he never explicitly told Greenberg that he was not a political dissident, the crux of his conversations with Greenberg was that he had concocted that identity with the help of Yury Mosha. (Tr. at 710–12.)

Because a rational jury could have found Greenberg guilty beyond a reasonable doubt on at least the first object of the conspiracy, her motion for judgment of acquittal under Rule 29 is denied.

### 2.     Danskoi

Danskoi's Rule 29 motion is substantially similar to Greenberg's.  He also joins in Greenberg's motion to the extent that her arguments are applicable to him.  He argues that the evidence was insufficient to show his specific intent to achieve any of the three objects of the conspiracy because he believed CS-3 to be gay and interpreted CS-3's contradictory statements to be evidence of his reluctance to admit his true sexual orientation after a lifetime of persecution in Ukraine.

As with Greenberg, a rational jury could have found Danskoi guilty beyond a reasonable doubt of conspiracy to defraud the United States and USCIS, in violation of 18 U.S.C. § 371.  As discussed above, a jury could reasonably conclude from the Government's evidence that a conspiracy existed to achieve this object.  And the Court must defer to the jury's assessment of the credibility of Danskoi and other witnesses.  For example, CS-3 testified as follows:

Question: Did Mr. Danskoi know if you were gay?

Answer: Yes, I told him that I'm not gay.

Question: Mr. Danskoi had no way of knowing whether you were telling the truth about being gay or not, correct?

Answer: Well, I told him that I was not gay.  But prior to that, of course he didn't know.

(Tr. at 358.)  The Government also introduced evidence consistent with Danskoi's knowledge that CS-3 was intending to submit a fraudulent asylum claim.

Question: What, if anything, did Danskoi instruct you to [wear] to the asylum interview?

> Answer: He said that I have to really know how to play this role, it has to be
> close to me, that I can have an earring, and I should change my clothes.

(Tr. at 175; GX 111.)  A rational jury could assess this testimony as direct evidence that Danskoi

had "entered into . . . an agreement to obstruct a lawful function of the government by deceitful

or dishonest means." *Atilla*, 966 F.3d at 130.

Danskoi also objects to the admission of WhatsApp messages between himself and

Mosha, arguing that they were prejudicial and lacked probative value.  There are two categories

of WhatsApp messages: those predating the charged conspiracy (sent before August 2018) and

those dated after the start of the conspiracy (sent during or after August 2018).

The WhatsApp messages between Danskoi and Mosha were properly admitted under

exceptions to the hearsay rule.  Danskoi's messages to Mosha were admitted as statements of an

opposing party under Federal Rule of Evidence 801(d)(2)(A).  Mosha's statements to Danskoi

from the start of the charged conspiracy in August 2018 were admitted as statements made by a

party's co-conspirator during and in furtherance of a conspiracy under Rule 801(d)(2)(E).

Admission under 801(d)(2)(E) requires that the Court find three facts by a preponderance of the

evidence: "(a) that there was a conspiracy, (b) that its members included the declarant and the

party against whom the statement is offered, and (c) that the statement was made during the

course of and in furtherance of the conspiracy."  *United States v. Coppola*, 671 F.3d 220, 246 (2d

Cir. 2012).  "Statements in furtherance of a conspiracy prompt the listener . . . to respond in a

way that promotes or facilitates the carrying out of a criminal activity."  *United States v. Desena*,

260 F.3d 150, 158 (2d Cir. 2001) (quotation marks omitted).

The evidence at trial showed by a preponderance that the charged conspiracy existed and

that it included Mosha and Danskoi.  Such evidence included websites, financial records, and

business records underscoring the close ties between Russian America's Manhattan office (run

by Mosha) and its Brooklyn office (run by Danskoi), as well as communications among Mosha, Danskoi, and their co-defendants.  The WhatsApp messages dated from August 2018 onward were in furtherance of the conspiracy because they discussed the logistics of Mosha and Danskoi's plan to create fraudulent bases for immigration applications.  (*See, e.g.*, GX-580-62-T at 6.)

The WhatsApp messages from Danskoi to Mosha pre-dating the charged conspiracy were also properly admitted.  When an indictment contains a conspiracy charge, "[e]vidence of uncharged acts is. . . admissible to demonstrate a pattern of conduct engaged in by defendant and others of which the crime charged was part." *United States v. Mavashev,* 455 F. App'x 107, 112 (2d Cir. 2012) (internal quotation marks and citations omitted).  In these messages, Mosha and Danskoi discussed renting space for sham businesses to provide artificial bases for their clients to apply for immigration documents.  (*See* GX-580-62-T at 3.)  This conversation demonstrates a clear pattern of conduct:  Mosha and Danskoi worked under the same brand, Russian America, and made a business out of creating and bolstering fraudulent immigration claims.  The fact that the two did not actually follow through with this particular plan does not change the analysis; the elements of conspiracy are (1) agreement; (2) specific intent; and (3) an overt act.  These messages go toward the first two elements because they illustrate Danskoi's agreement with Mosha and his specific intent to defraud the United States and USCIS; a pattern of conduct that continued and underlay the charged conspiracy.

Most broadly, Danskoi argues that all the WhatsApp messages were inadmissible under the Federal Rules of Evidence because their probative value was substantially outweighed by unfair prejudice.  Fed. R. Evid. 403.  Danskoi's argument is without basis.  The WhatsApp messages are not evidence that "tends to have some adverse effect upon a defendant beyond

tending to prove the fact or issue that justified its admission into evidence." *United States v. Massino*, 546 F.3d 123, 132 (2d Cir. 2008) (citation omitted). The messages were directly relevant to proving the conduct underlying the charged conspiracy. Evidence risks unfair prejudice when, for example, it tends "to prove some adverse fact not properly in issue or unfairly to excite emotions against the defendant." *Id.* That is not the case here.

The WhatsApp messages were properly admitted.

Danskoi's Rule 29 motion is therefore denied.

### B.     Rule 33

#### 1.     Greenberg

Greenberg asserts three justifications for a new trial pursuant to Rule 33: first, constitutionally ineffective assistance on the part of her trial counsel; second, error in the jury instructions on conscious avoidance and attorney ethics; and third, prosecutorial error in the Government's statements to the jury regarding the requirement of materiality.

##### a.     Assistance of Trial Counsel

Greenberg argues that trial counsel rendered ineffective assistance by, first, stipulating to the Government's translations of certain recorded conversations conducted in Russian and, second, failing to put forth an entrapment defense. Neither argument is convincing.

To prevail on an ineffective assistance of counsel claim, a defendant must demonstrate that (1) her counsel's representation fell below an objective standard of reasonableness and (2) this deficient performance caused prejudice to the defendant. *Strickland v. Washington*, 466 U.S. 668, 688, 692 (1984). On the first prong, "[t]he court 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' bearing in mind that '[t]here are countless ways to provide effective assistance in any given case' and that '[e]ven the best criminal defense attorneys would not defend a particular client in the same

way.'" *United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) (quoting *Strickland*, 466 U.S. at 689). "Actions and/or omissions taken by counsel for strategic purposes generally do not constitute ineffective assistance of counsel." *Gibbons v. Savage*, 555 F.3d 112, 122 (2d Cir. 2009). A defendant may establish ineffective assistance, however, where counsel made "omissions [that] cannot be explained convincingly as resulting from a sound trial strategy, but instead arose from oversight, carelessness, ineptitude, or laziness." *Wilson v. Mazzuca*, 570 F.3d 490, 502 (2d Cir. 2009) (citation omitted). On the second prong, prejudice is shown where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 499 (citation omitted). Courts need not address both factors if the defendant fails to make the requisite showing as to one of them. *Id.* at 697.

### *Translation Stipulation*

Greenberg first argues that her trial counsel gave a constitutionally defective performance by stipulating to the accuracy of translations provided by the Government and largely ignoring Greenberg's requests to listen to the FBI's recordings and judge their accuracy for herself. According to Greenberg, the stipulation "unnecessarily walled off a potential avenue of defense" (ECF No. 244 at 26) because the jury could have heard what Greenberg views as more accurate translations of her conversations with the Government's key witnesses. Greenberg also emphasizes that trial counsel's decision was objectively unreasonable because he is not a Russian speaker and because he failed to object to the admission of the translations on Confrontation Clause grounds.

Greenberg has not shown that trial counsel's stipulation on the translations fell below an objective standard of reasonableness or that trial counsel acted in a manner consistent with carelessness, ineptitude, laziness, or oversight. As an initial matter, Greenberg admits that she

was able to listen to some of the FBI recordings, which diminishes her portrayal of trial counsel as completely shutting her out of the trial preparation process.  Additionally, the Court has no basis to conclude that trial counsel uncritically accepted the Government's translations.  The record reflects that the parties discussed Greenberg's objections to particular translations and that the final stipulated translations reflected changes proposed by Greenberg's counsel.[4]  (Tr. 601:2-11.)  Greenberg does not contest this point, arguing instead that if she had had more time to listen to the recordings, she *may* have identified further inconsistencies and raised them during trial.  Even if this were true, it is still not enough to overcome the fact that trial counsel made a reasonable strategic decision to advocate for changes to the translations where appropriate prior to trial, and not to spend time during trial cross-examining the Government's translator about a handful of inconsistencies.  Additionally, the trial record reflects at least one instance where Greenberg's objection to a translation choice was noted before the document was admitted into evidence, which further undermines the idea that trial counsel carelessly stipulated to the Government's translations.  (*See* Tr. at 114:5-8.[5])

Even assuming that trial counsel's decision to stipulate was objectively unreasonable, Greenberg has still failed to show a reasonable probability that the result would have been different had trial counsel refused to stipulate.  While Greenberg makes a broad argument about the unreliability of the Government's translations as a whole, the Court's analysis must

---

[4] "Mr. Rebold: So shortly before, a few days before trial, we spoke with counsel. We provided them the versions of the transcripts that the translation company had sent us. We asked counsel if they had any proposed changes, to see if we could reach an agreement and a stipulation. They proposed some changes to us, and we also caught one or two issues with it. We discussed it. And we agreed to make certain—many of them are small changes and not very material . . . ."  (Tr. 601:2-11.)

[5] "Greenberg agrees to everything in this stipulation, except that with regard to Government Exhibit 140-T, she believes that the phrase "ashamed of" on page 19, line 12 should instead be 'shy about.'"

necessarily focus on specific material errors that she is able to identify for consideration.  *See*

*Parrilla v. United States*, No. 13-CR-360, 2021 WL 4066021, at *10 (S.D.N.Y. Sept. 7, 2021)

("Petitioners have not identified any material errors in the transcripts prepared . . . that, taken

individually or collectively, establish a reasonable probability of a different result if they had

been corrected.").

Of the translation errors that Greenberg specifically highlights, the most significant are:

(1) in GX 140-T, where Greenberg argues that the Government's translation inserted the word

"lying" where it is not audible in the original Russian audio;[6] and (2) in GX 130-T, where

Greenberg argues that the Government's use of the word "warn" created a nefarious implication

where it was not warranted, improperly bolstering the evidence of a conspiracy.[7]  An

examination of the record indicates that even if these errors had been corrected, it is unlikely that

a different outcome would have resulted.

When defense counsel conducted his direct questioning of Greenberg in reference to the

recording at GX 140-T, he quoted the language at issue and asked Greenberg, "What are you

trying to convey here?"  (Tr. 880:5-15.)  She responded, "I'm giving him a way out if he's lying.

I'm telling him things that I don't believe."  (*Id.* at 16-21.)  Greenberg's recollection of the

conversation does not contradict how the Government portrayed the gist of the exchange;

instead, it aligns with the idea that Greenberg was telling CS-3 that an immigration officer would

be able to tell if he was lying.  According to Greenberg, she was simply advising her client that

---

[6] GX 140-T at 19 ("Julia: I want to tell you that both I and the officer, we roughly imagine when a person is lying").

[7] GX 130-T at 6 ("Uladzimir:  So I made copies specially.  And I'll send the file myself, I'll send the story to her.  But I will send it in English.  She doesn't need it in Russian.  CHS: OK, good.  Uladzimir:  And discuss all these issues, and I will warn her what needs to be done, okay?")

he needed to come across as genuine in describing his sexual orientation to an asylum officer who would likely have predisposed stereotypes about gay men.  According to the Government, she was cautioning him that his fraud would be easily discovered if he failed to play the part better.  The jury was entitled to make a credibility determination about these competing interpretations; the record does not support a conclusion that deleting the word "lying" from the Government's translation would have made a material difference in the context of this testimony.

Second, Greenberg's arguments about the phrase "I'll warn" are unavailing.  As Greenberg notes, other potential translations included "I'll tell," "I'll notify," and "I'll alert." (ECF No. 244 at 29.)  Even if trial counsel had insisted on changing the translation to one of these alternatives, it is unlikely that the outcome of the trial would have been favorable toward Greenberg.

Third, there is no showing of prejudice because even if the jury had heard Greenberg's version of the challenged translations, it could have found guilt beyond a reasonable doubt based on other evidence presented at trial, including Greenberg's post-arrest statement, which was entirely in English.

Finally, Greenberg's Confrontation Clause argument fails.  The Second Circuit has held that defense counsel "may waive a defendant's Sixth Amendment right to confrontation where the decision is one of trial tactics or strategy that might be considered sound."  *United States v. Plitman*, 194 F.3d 59, 64 (2d Cir. 1999).  For the reasons discussed above, trial counsel's decision on the stipulations was strategically sound.

### *Entrapment Instruction*

Greenberg has not shown that trial counsel's decision not to raise an entrapment defense fell below an objective standard of reasonableness, meaning that the first prong of *Strickland* is

not satisfied.  As a threshold matter, "[t]he choice of a defense strategy at trial is one of the 'virtually unchallengeable' tactical decisions left to the judgment of defense counsel." *United States v. Balis*, No. 03 CR. 1028, 2009 WL 1117274, at *5 (S.D.N.Y. Apr. 24, 2009) (quoting *United States v. Cohen*, 427 F.3d 164, 170 (2d Cir. 2005)).  As Judge Lynch thoroughly explained in *Balis*, competent defense counsel often have good reason to strategically avoid raising the "notoriously difficult defense" of entrapment.  *Balis*, 2009 WL 1117274 at *5.

An entrapment defense contains two elements: the government's inducement of the crime and the defendant's lack of predisposition to engage in the criminal conduct.  *See United States v. Cabrera*, 13 F.4th 140, 146 (2d Cir. 2021).  "[W]hen a defendant has presented credible evidence of inducement by a government agent, the government has the burden of proving beyond a reasonable doubt that the defendant was predisposed to commit the crime."  *Id.* (citation omitted).  "The Government may show predisposition, among other things, by evidence that the defendant responded readily to the inducement, and by evidence of 'an existing course of criminal conduct similar to the crime for which he is charged.'"  *Balis*, 2009 WL 1117274, at *6 (quoting *United States v. Valencia*, 645 F.2d 1158, 1167 (2d Cir. 1980)).

Trial counsel made a reasonable strategic decision against pursuing an entrapment defense.  First, while entrapment may be argued in the alternative, it "in effect admits that the defendant engaged in criminal conduct, and attempts to explain away the commission of criminal acts.  Defense counsel tend to shy away from alternative arguments that dilute [the] force of a denial of wrongdoing."  *Balis*, 2009 WL 1117274, at *6.  That may have been the case here, where much of Greenberg's defense rested on an argument that she was *not* part of the charged conspiracy because she did not display either agreement with the other indicted individuals or specific intent.  Second, trial counsel may have been reluctant to open the door to the

Government placing additional emphasis on evidence going toward Greenberg's predisposition to join the charged conspiracy.  Trial counsel's decision not to request an entrapment instruction was a valid tactical decision.

**b.      Jury Instructions**

Greenberg argues that the Court's instructions to the jury on conscious avoidance and attorney ethics were erroneous.  These arguments are without merit.

### *Conscious Avoidance*

Greenberg challenges the language of the Court's conscious avoidance instruction.  (Jury Charge at 45 – 47.)  Here, Greenberg makes two distinct arguments: first, that the instruction was given without the requisite factual predicate, and second, that the language of the instruction allowed the jury to substitute a finding of conscious avoidance for the specific intent required to prove conspiracy.  Greenberg's trial counsel objected to the conscious avoidance instruction prior to the jury's retiring to deliberate.  (*See* Tr. 1205.)

"[A] conscious-avoidance instruction is legally appropriate when a defendant challenges his knowledge of the object of the alleged conspiracy."  *United States v. Espino*, No. 21-1412, 2022 WL 4112679, at *4 (2d Cir. Sept. 9, 2022) (summary order), *cert. denied*, 143 S. Ct. 845 (2023) (citing *United States v. Ferrarini*, 219 F.3d 145, 154 (2d Cir. 2000)).  A factual predicate exists for a conscious avoidance charge when "the evidence is such that a rational juror may reach the conclusion beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact."  *United States v. Kaplan*, 490 F.3d 110, 127 (2d Cir. 2007) (citation omitted).  In other words, the evidence must show "that the defendant deliberately avoided learning the truth."  *Ferrarini*, 219 F.3d at 157.

19

In this case, a rational juror could reasonably have concluded beyond a reasonable doubt that Greenberg was aware of a high probability that CS-1 and/or CS-3 were presenting fraudulent bases for asylum and that she consciously avoided confirming that fact.  The crux of Greenberg's argument is that CS-1 and CS-3 never stated outright that they were fabricating their claims, and that some of their statements seemed to genuinely support their claimed membership in each protected social group.  (*E.g.*, Tr. 884:19-25; 885-886.)   Greenberg argues that she was in fact initially suspicious of whether CS-3 was gay, but after probing into his story, ultimately felt convinced that her suspicions were misplaced.  (Tr. 887:1-6; 20-25.)  She emphasizes that "[t]here is no evidence that she took any act to consciously avoid learning anything."  (ECF No. 244 at 38.)

The Second Circuit addressed a similar issue in *Espino*, where the defendant argued that a conscious avoidance instruction required a showing that he had taken some deliberate action to avoid learning a relevant fact.  2022 WL 4112679, at *4.  The court rejected this view, concluding that the charge is properly given where "a defendant's involvement in the criminal offense may have been so overwhelmingly suspicious that the defendant's failure to question the suspicious circumstances establishes the defendant's purposeful contrivance to avoid guilty knowledge."  *Id.* (quoting *United States v. Kozeny*, 667 F.3d 122, 134 (2d Cir. 2011)).

That is the case here.  While Greenberg argues that the contradictions in CS-3's statements led her to conclude that he truly was a gay man, a rational juror could have come to the opposite conclusion: that CS-3's contradictory narrative about the contents of his asylum application and what was supposedly his life story created circumstances "so overwhelmingly suspicious" that Greenberg's failure to directly confirm that he was actually a gay man shows a purposeful contrivance to avoid guilty knowledge.  *See United States v. Lewis*, 545 F. App'x 9,

11–12 (2d Cir. 2013) ("Red flags about the legitimacy of a transaction can be used to show both actual knowledge and conscious avoidance." (quoting *United States v. Ferguson*, 676 F.3d 260, 278 (2d Cir. 2011)).

Second, Greenberg argues that the instruction was erroneous because it allowed the jury to rely on a conscious avoidance theory to satisfy the requirement that Greenberg had specific intent to participate in a conspiracy. Conscious avoidance may not be used to support a finding about a defendant's intent to participate in a conspiracy, but it may be used to support a finding that a defendant had knowledge about the conspiracy's unlawful *goals*. *Ferrarini*, 219 F.3d at 155. The Court's instructions were clear on this distinction:

> Here, because the Defendants are charged with participating in a conspiracy, it is also important to note that the concept of conscious avoidance cannot be used as a substitute for finding that the Defendants knowingly agreed to a joint undertaking, and you can only find the Defendants guilty if the evidence proves, beyond a reasonable doubt, that the Defendants knowingly and intentionally joined the conspiracy charged in the Indictment. However, if you find beyond a reasonable doubt that the Defendants entered into such an agreement, you may—if the evidence proves it beyond a reasonable doubt—rely on a finding of conscious avoidance to decide whether they knew that the specific objective or goal of that agreement was to defraud the United States and one of its agencies, USCIS or commit immigration fraud.

(Jury Charge at 47.) Greenberg takes issue with the second sentence, arguing that "[i]nstead of instructing the jury that conscious avoidance could only serve as the basis for finding *knowledge of* the unlawful aims of the conspiracy, the instruction allowed the jury to invoke the conscious avoidance doctrine to find that Ms. Greenberg *knew that* she was agreeing to a specific object or goal." (ECF No. 244 at 42.) This is a distinction without a difference. The second sentence of the instruction properly describes whether Greenberg knew about the *goals* of the conspiracy; it does not describe her agreement or intent to *join* the conspiracy. *See Lewis*, 545 F. App'x at 11.

Ｔhe conscious avoidance instruction was therefore not erroneous.

*Attorney Ethics*

Greenberg next argues that the Court's instruction on the ethical duties of attorneys was erroneous.  (*See* ECF No. 187 at 37–38.)  She asserts that it mischaracterized the obligations imposed by New York Rule of Professional Conduct Rule 3.3 by describing the USCIS agent conducting an asylum interview as a tribunal.  Because trial counsel did not object to the instruction before the jury began deliberations, a plain error standard of review applies.  *United States v. Botti*, 711 F.3d 299, 308 (2d Cir. 2013) (citation omitted).  To establish plain error, a defendant must show: "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings."  *United States v. Moore*, 975 F.3d 84, 90 (2d Cir. 2020) (citation omitted).  A "plain" error is one that is "so egregious and obvious that a trial judge and prosecutor would be derelict in permitting it in a trial held today."  *United States v. Bastian*, 770 F.3d 212, 220 (2d Cir. 2014) (internal quotation marks omitted).

The ethics instruction does not constitute plain error.  The Government and Greenberg disagree about the precedential value of the Second Circuit's decision in *Medina v. Gonzales*, 404 F.3d 628 (2d Cir. 2005), which the Government relied upon in proposing the instruction.  According to the Government's view of that case, the Second Circuit endorsed an interpretation of the Immigration and Nationality Act by the Board of Immigration Appeals (BIA), which determined that an asylum officer conducting an asylum interview is a tribunal.  *See id.* at 635 ("The BIA also reasoned that an asylum officer possesses what, in the BIA's view at least, are the 'fundamental attributes' of an administrative tribunal . . . ." (citations omitted)).  Greenberg counters that while the Second Circuit found the BIA's interpretation sufficiently reasonable to

merit *Chevron* deference, it had a skeptical tone toward categorizing the asylum officer as a tribunal. *See id.* at 634.  But even if the Second Circuit did evince some skepticism that could lend credence to a "reasonable dispute" on this issue, Greenberg has identified no basis from *Medina* to conclude that the instruction contained a clear, obvious, or egregious error.

Greenberg counters that the BIA's interpretation of the term "tribunal" is irrelevant because the ethics instruction explained Greenberg's duties under the New York Rules of Professional Conduct, and therefore, the only relevant question is how the New York State Bar Association Committee on Professional Ethics (the "Committee") interprets the term.  Greenberg cites the Committee's Ethics Opinion 1101 (2014), which stated that certain immigration proceedings did not qualify as "tribunals" because the term does not "encompass an administrative procedure involving a unilateral application for a benefit."  (ECF No. 244 at 46–47.)

But even if the Court were to rely solely on the guidance from the Committee, the ethics instruction is neither clearly nor obviously erroneous.  In the facts before the Committee, an attorney filed employment-based immigrant visa petitions with the Department of Labor and Department of Homeland Security.[8]  The lawyer, relying on representations from their client, signed and submitted each application to each Department.  The applications later turned out to be fraudulent.  The Committee found that this process did not display key characteristics of a "tribunal" because, for example, there was no oral proceeding — there were only paper submissions and attestations — and the government officials responsible for assessing the applications were not triers of fact.  An asylum officer presiding over an asylum interview has a

---

[8] *See* N.Y. Bar Ass'n Comm. on Pro. Ethics, Op. 1011 (N.Y.B.A July 29, 2014), *available at* https://archive.nysba.org/CustomTemplates/Content.aspx?id=51094.

fundamentally different role, having "authority to hear and decide . . . [and] to render judgments

in accordance with the facts and the law." *Medina*, 404 F.3d at 635 (citation omitted).

Additionally, the asylum officer is "vested with numerous adjudicative powers including the

power to administer oaths, the power to take and consider evidence, the power to compel

testimony by subpoena, and even the power to grant withholding of deportation and asylum." *Id.*

at 636.  And, of course, the asylum interview is a live oral proceeding.  Because the Committee's

opinion addresses facts that are not analogous to those here, it does not foreclose a conclusion

that an asylum interview before an immigration officer is a tribunal.

Finally, Greenberg makes a more general point that the ethics instruction was presented

in a "slanted and misleading manner" because it did not include certain nuances or comments to

the New York Rules of Professional Conduct relating to a lawyer's obligations regarding false

testimony and the attorney's obligation to withdraw.  (*See* ECF No. 244 at 49–50.)  This does not

support a finding of clear error because the instructions accurately summarized the contents of

the relevant rules.

The ethics instructions therefore do not support a finding of plain error.

### c.      Prosecutorial Error

Finally, Greenberg argues that the Government improperly asserted in rebuttal that

materiality was a required element for only the third object of the conspiracy rather than all three

objects.  (Tr. 1391.)  This issue is subject to the plain error standard because trial counsel did not

object before the jury retired to deliberate.

"[A] defendant who seeks to overturn his conviction based on alleged prosecutorial

misconduct in summation bears a heavy burden." *United States v. Farhane*, 634 F.3d 127, 167

(2d Cir. 2011) (citations and quotation marks omitted).  It is insufficient to show that a comment

made during summation was improper.  *Id.*  Instead, a defendant must show that "the comment, when viewed against the entire argument to the jury, and in the context of the entire trial, was so severe and significant as to have substantially prejudiced him, depriving him of a fair trial."  *Id.* (internal citations and quotation marks omitted).

The Government's statements accurately reflected the elements of the first object.  *See* 18 U.S.C. § 371.  Greenberg cites *Neder v. United States*, 527 U.S. 1, 1 (1999), and other cases for the proposition that all federal fraud statutes contain an implicit requirement of a material falsehood, which flows from the common law.  But *Neder* held that materiality is an element of a "scheme or artifice to defraud" under the federal mail fraud, wire fraud, and bank fraud statutes. *See id.* at 20.  Those statutes are distinct from the *Klein* conspiracy charged as the first object here.  In more recent cases, the Second Circuit has given no indication that materiality is an element of a *Klein* conspiracy.  *See, e.g.*, *United States v. Coplan*, 703 F.3d 46, 61 (2d Cir. 2012) (listing the elements of a conspiracy under 18 U.S.C. § 371).

As to the second object, 18 U.S.C. § 1546(a), paragraph 1, the Government's statements also accurately reflected the formal elements of the offense.  *See* Leonard B. Sand *et al.*, 2 *Modern Federal Jury Instructions*, Criminal Instructions 47-1; 47-2.  Nonetheless, Greenberg argues that while the statute does not explicitly contain a materiality requirement, one must be inferred.  Greenberg relies on *United States v. Avelino*, 967 F.2d 815, 817 (2d Cir. 1992).  In that case, the Second Circuit held that a similarly worded "by means of" clause located in 18 U.S.C. § 542, which prohibits the importation of goods by means of false statements, necessarily implied a materiality requirement.  *Id.*  But contrary to Greenberg's assertions, *Avelino* does not support a conclusion that there was prosecutorial error here.  The Second Circuit concluded that the "by means of" requirement in 18 U.S.C. § 542 had the same effect as the materiality

requirement in 18 U.S.C. § 1001 for the purpose of the *Blockburger* test, meaning that the defendant could not be punished under both statutes for the same offense. *Id.* ("Section 1001's materiality requirement is redundant because false statements under Section 542 are necessarily material because the importation must be 'by means of [the] false statement.'"). It is therefore accurate to state that 18 U.S.C. § 1546(a) does not contain a materiality element. Rather, it contains a "by means of" clause that has a similar effect, which was accurately reflected in the jury instructions.

Further, even if the Government misstated the law in stating to the jury that materiality was not required for this object, the Court concludes that the Government's brief comment during its rebuttal summation, viewed in the context of the entire summation and the entire trial, did not constitute plain error. The rebuttal comment was not so severe that it prejudiced Greenberg's substantial rights. This is especially true because Greenberg has not actually challenged the text of the relevant jury instruction. Nor does the Court conclude that the Government's comment constitutes a "manifest injustice" that would require a new trial. *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). "[B]efore ordering a new trial pursuant to Rule 33, a district court must find that there is a real concern that an innocent person may have been convicted." *McCourty*, 562 F.3d at 475 (internal quotation marks omitted). Even setting aside the second object, a jury had sufficient evidence to find Greenberg guilty on the first and third objects of the conspiracy — the latter of which explicitly required a finding of materiality.

Greenberg's Rule 33 motion is therefore denied.

### 2.   Danskoi

Having presented no separate arguments from Greenberg's on his Rule 33 motion, Danskoi's motion is likewise denied.

**IV.     Conclusion**

For the foregoing reasons, Greenberg and Danskoi's motions for judgment of acquittal and, in the alternative, for a new trial are denied.

The Clerk of Court is directed to close the motions at ECF Numbers 243 and 244.

SO ORDERED.

Dated: June 27, 2023
       New York, New York

_____
              J. PAUL OETKEN
        United States District Judge