The Law Office of James M. Branden
80 Bay Street Landing, Suite 7J
Staten Island, New York 10176
Tel. 212-286-0173
Fax 212-286-0495

September 14, 2023

Hon. J. Paul Oetken
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

    Re:  United States v. Uladzimir Danskoi
         Cr. Docket No. 21-92 (JPO)

Dear Judge Oetken:

    I represent Mr. Danskoi in the above-referenced matter. For the reasons set forth below, Mr. Danskoi should be sentenced to time served (4 days) and a term of supervised release.

### STATEMENT OF THE CASE

<u>Background</u>

    Mr. Danskoi was born in the old Soviet Union in 1967. He is now 56 years old. When he was three years old, the family moved to Minsk, now the Capitol of Belarus. His father, 90 years old, is retired there. His mother is dead and his only sibling, a brother, lives in Italy.

    Mr. Danskoi has both high school and college degrees. During his senior year of college, 1987, Mr. Danskoi met Svetlana Ralko and they married. Together they have two children: Yolha is 34 years old, resides in Cyprus and is employed in the IT field; her brother, Pavel, is 29, resides in the United States, is a U.S. Army Reservist, and also a long-haul truck driver. After college, Mr. Danskoi managed a television and radio repair shop in Minsk. He also worked for a liquor producer.

    Belarus, a landlocked region in eastern Europe, was part of the Soviet Union from 1944 until 1991, when, during the dissolution of the Soviet Union, Belarus asserted independence. Alexander Lukashenko was elected in the first presidential election of 1994 on a campaign that included re-establishing close ties with Russia. He presides with an "iron first" over an increasingly

Hon. J. Paul Oetken
United States District Judge
September 14, 2023
Page 2

authoritarian, repressive regime and is known as Europe's "Last Dictator" for reducing parliamentary input and centralizing presidential power, outlawing privatization of state enterprises, denying the opposition access to state media, vote rigging, and removal of term limits (Lukashenko is now serving his sixth term). One year after his election, and in keeping with his campaign platform, Lukashenko signed a friendship and cooperation pact with Russia, upon which it remains energy-supply dependent. In 2010, when Lukashenko was re-elected to a fourth term, the opposition and western observers alleged vote rigging. Mass protests in Minsk were broken up by force with 600 arrests. The fifth (2015) and sixth (2020) presidential elections were also criticized as rigged and unfair, and the mass protests that ensued were forcibly and systematically suppressed. As to present-day Belarus, according to the Human Rights Watch, Belarusian authorities:

> continue their "purge" of independent voices prosecuting and harassing human rights defenders, journalists, lawyers, opposition politicians, protesters, and activists. Hundreds remain behind bars on politically motivated charges and face ill-treatment in detention. No rights organization is able to operate legally in Belarus. [The] authorities have prosecuted critics of Russia's war in Ukraine and brutally dispersed anti-war protests, while allowing Russian forces to use Belarus territory to support their invasion of Ukraine since February 24, 2022. Belarus remains the only country in Europe and Central Asia to use the death penalty and expanded the crimes to which it can be imposed in 2022.

Mr. Danskoi was part of the opposition in Belarus. In 1999, during Lukashenko's first term, he was arrested for participating in political demonstrations. While detained, his arms were restrained above his head and he was struck from behind with the butt-end of rifles. Referencing the 2010 protests above, Mr. Danskoi retained attorneys for those arrested. As a result, in 2011, he was arrested and detained on false charges of bribery. His detention lasted eleven months during which time he was tortured, strung up by his wrists (more securely and over a lengthier period than before), which caused permanent nerve damage and disfigurement (PSR at ¶¶87, 94). Mr. Danskoi's arrest and

detention also led to the demise of his marriage. Ms. Ralko and he were divorced in 2011 (though they are cordial and remain in contact).

When released (charges withdrawn), Mr. Danskoi made the obviously difficult but prudent decision to leave his homeland and his aged and beloved father and come to the United States. He entered this Country in October 2013. He married Aksana Valasevich the following year in Brooklyn. They now reside in Staten Island, with Pavel when he is not on the road. Mr. Danskoi and Aksana work together in several Internet information services businesses earning approximately $50,000 annually. In addition, Mr. Danskoi is employed as a driver for PNK Group, a real estate developer, including industrial parks, operating in the U.S. market since 2017. This side job brings in approximately $48,000 a year. Mr. Danskoi speaks to his father almost every day and until his arrest on this matter visited once yearly.

Aside from the nerve and joint pain (fingers, toes and knees) inflicted in Minsk, Mr. Danskoi also suffers from inflammatory arthropathy and moderate-to-severe rheumatoid arthritis. For the arthritis he is prescribed both an injectable (methotrexate) and an oral capsule (Rinvoq). Mr. Danskoi does not suffer from any notable mental or emotional health issues. He has no present or prior drug or alcohol abuse history.

As noted above, Mr. Danskoi was arrested twice in Belarus for his participation in peaceful protests to an increasingly authoritarian regime and rigged elections. He has never been convicted of any crime there. He has no criminal history in this Country.

While on pretrial supervision, Mr. Danskoi has abided by all conditions of release (PSR at ¶10).

<u>The Offense</u>

Mr. Danskoi and others were charged with conspiring to defraud the United States and to commit immigration fraud (involving the filing of false claims of persecution to obtain political asylum), in violation of 18 U.S.C. §371. The charge resulted from an FBI "sting" operation that involved the use of one confidential source and two cooperating witnesses.

Hon. J. Paul Oetken
United States District Judge
September 14, 2023
Page 4

    Mr. Danskoi was associated with Russian America(RA), an agency that assisted recent immigrants from Russia and the Commonwealth of Independent States with immigration-related needs.  Most of the evidence against Mr. Danskoi came from the confidential source (CS), who purported to be from Ukraine and needed assistance with regard to his visa.  Mr. Danskoi advised that he should pursue political asylum, instead.  Of the types of persecution that would support political asylum, the FBI told CS to claim he feared future persecution if returned to Ukraine based on sexual orientation. Mr. Danskoi referred CS to co-defendant Kateryna Lysyuchenko, who worked with CS to draft a supporting affidavit detailing his homosexuality.  Mr. Danskoi also referred CS to co-defendant Julia Greenberg, an attorney, who prepared CS for his asylum interview and represented him at that interview.  At trial, it was the government's theory that CS had made it clear to all three, even if not explicit, that he was straight and that the application was fraudulent.

    Mr. Danskoi testified at trial.  He said that eight months after coming to the United States he read an advertisement on a Russian website for a "partner."  Mr. Danskoi called the number and spoke with Mosha (1056).  In a follow-up meeting, Mosha explained that he owned RA, which provided services to immigrants, and had a popular website and a YouTube channel.  The services offered included: airport transportation and assistance with finding a residence, opening bank accounts and credit lines, and obtaining identification and health insurance (1057).  After reviewing the website and channel, Mr. Danskoi decided to work with Mosha (1058). It was agreed that Mosha would open an office in Manhattan and Mr. Danskoi would open a satellite office in Brooklyn.  In addition, Mr. Danskoi would pay Mosha $10,000 to have his name and contact information also listed on the website (1059).[1]  Mr. Danskoi opened a bank account, rented a room above a video store, and advertised his services on the internet (1060).

    While Mosha eventually listed Mr. Danskoi as an "owner" of RA, the profit sharing was unequal. For the first two-plus years, Mr. Danskoi paid Mosha 50% of his profit but received none of Mosha's profits (1063, 1066).  In 2017, Mr. Danskoi addressed the inequity and the two agreed simply to retain their individual profits and to

---

[1] As it turned out, Mr. Danskoi only paid Mosha $7,000 (1069).

Hon. J. Paul Oetken
United States District Judge
September 14, 2023
Page 5

refer clients to each other, as either deemed appropriate (1067-68). In 2017 or 2018, Mr. Danskoi moved his office to 1123 Avenue Z, second floor, in Brooklyn, an office he maintained until his arrest (1062).[2]

As to clients seeking political asylum, Mr. Danskoi did not have any during the first six months. Over time, he believed he may have had as many as 60 such clients (1222). Mosha advised Mr. Danskoi of the necessary steps: if a client wants to pursue political asylum, tell him or her the possible grounds of persecution, the procedural steps, and the cost and then refer to him or her to Lysyuchenko, who had been working for Mosha freelance for some time (1066-67, 1156). In keeping with this instruction, Mr. Danskoi never himself prepared the applications or the supporting affidavits; Lysyuchenko provided those services (1222).

As to CS, Mr. Danskoi learned at the first meeting in his office on Avenue Z, that he was 52 years old, never married and had no children (358-59). Mr. Danskoi advised CS that because CS was already "out of status" and because CS expressed "circumstances" that precluded return to Ukraine, political asylum would be the "best option" (1082, 1210). Mr. Danskoi then listed the types of persecution that may warrant asylum (1084). Mr. Danskoi pressed to understand the preclusive "circumstances" and CS said that he had "a bit of trouble with the law there" (1085). Mr. Danskoi tried to explain that if CS merely broke the law in Ukraine that would not be a basis for asylum and then reiterated the proper bases for asylum (1086, 1213).

Mr. Danskoi said that the only other option was marriage to a United States citizen and an application for family reunification (1096-98). He cautioned, however, that RA would not search for a wife or a groom for him (1098-99). In mentioning "groom," Mr. Danskoi believed he might elicit why the CS – as noted, a middled aged man, never married with no children – was persecuted in Ukraine (1099).

As to asylum procedure, CS wanted to know if he had to write

---

[2] On cross-examination, Mr. Danskoi agreed that in 2019 and 2020, Mr. Danskoi was listed in the Department of State records as "CEO" (1150-51). On certain other records he was listed as "Director" and "Vice-President" (1151-52, 1163-64).

the story (1100). Mr. Danskoi said "yes" but he would provide a specialist to work with him (1100).

In a second meeting, Mr. Danskoi told CS that he would be working with Lysyuchenko but he would still be required to write his own story (1106).

In a third meeting, CS told Mr. Danskoi that he wanted to pursue asylum based on persecution for his sexual orientation (1108). The conversation drifted a bit before CS interjected "Well, I'm not gay" (1111, 1232). Mr. Danskoi said that CS "fidgeted on the chair" when he said that and that Mr. Danskoi was under the "impression" that CS was embarrassed or too shy to discuss the matter (1112, 1266). Mr. Danskoi responded that he did not hear what CS just said because CS was a client and he need not be taciturn with Mr. Danskoi (1112, 1232). He went on to say that his gay clients were his preferred clients and tried to put CS at ease (1112-13). He tried to convey his understanding that CS "might have some type of a complex, but he can talk to me" (1113).

Mr. Danskoi recalled subsequent meetings in which CS said that he wrote "the story" and sent it to Lysyuchenko but that she was not helping him enough (1117-18). Mr. Danskoi said that CS had to work it out with her and despite what appeared to Mr. Danskoi to be a limited vocabulary, CS needed to express "his feelings" (1118, 1241). When CS offered to pay more money for greater assistance, Mr. Danskoi thought CS was asking him and Lysyuchenko to make up something on his behalf and Mr. Danskoi refused the offer (1120).

When all the application papers, including CS's affidavit, were complete, Russian and English versions were sent by Lysyuchenko to Mr. Danskoi (1125). Mr. Danskoi read the papers and had "no doubts" that the affidavit was written by CS because it was "very concise" (1125). Mr. Danskoi made no changes or additions (1125-26).

Mr. Danskoi and Greenberg, who also testified, were convicted after trial. Lysyuchenko pleaded guilty.

<u>The Sentences of Related Defendants</u>

Mosha, the director of RA, and its public face, was charged with fraud relating to the two cooperating witnesses (both falsely claiming that they blogged about political corruption in their

native land; the blogs were actually ghost-written by a journalist Mosha recommended). He pleaded guilty with a resulting guidelines range of imprisonment of 12-18 months. He was sentenced to 10 months' imprisonment. Greenberg's misconduct involved both CS and one of the two fake bloggers. Her guidelines range of imprisonment was 21-27 months. She was sentenced to three months' imprisonment. Lysyuchenko, who was involved in the same two matters as Greenberg, faced a guidelines range of imprisonment of 4-10 months. She was sentenced to time served (roughly two months in detention) and no supervised release.[3]

### Defendant's Immigration Consequences

Mr. Danskoi's wife, Aksana Valasevich, is a U.S. citizen. Mr. Danskoi is not. He is a lawful permanent resident with an application pending for naturalization. I have consulted with an immigration expert and without divulging his precise analysis, he is of the belief that Mr. Danskoi will be removed as a result of the instant offense.

### Attached Character Letters

Attached are letters from Mr. Danskoi's son, his landlord and neighbor. Mr. Danskoi is proud and embarrassed to ask others to write letters on his behalf, but these few speak compellingly to his positive, responsible and generous character.

---

[3] In her sentencing submission, Lysyuchenko described Mosha as her "main superior" (Docket Entry 282 at 8). She stopped working for him in mid-2019 "after he became verbally abusive and failed to timely pay her on several occasions, and after it became clear to [her] that she could no longer comply with Mr. Mosha's unlawful directions." Id. at 9. She continued to work with Mr. Danskoi, however, because she believed he had parted with Mosha and he was not asking her to work on fictive biographies. Id. at n. 1. Similarly, in Greenberg's sentencing memorandum, she described Mosha as one "in the business of unlawfully subverting the immigration system for personal gain at every turn." (Docket Entry 275 at 11). As to Mr. Danskoi, she mentioned only that he was Mosha's "purported" partner. Id.

Hon. J. Paul Oetken
United States District Judge
September 14, 2023
Page 8

**ARGUMENT**

MR. DANSKOI SHOULD BE SENTENCED TO TIME SERVED AND
A TERM OF SUPERVISED RELEASE

Under 18 U.S.C. §3553(a)(2), the Court "shall impose a sentence sufficient, but not greater than necessary" to comply with generally recognized purposes of sentencing, including the need:

A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

B) to afford adequate deterrence to criminal conduct;

C) to protect the public from further crimes of the defendant; and

D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

Sentencing courts are also advised to consider, among other things and as relevant here: the nature and circumstances of the offense, the history and characteristics of the defendant, the applicable sentencing range as established by the now-advisory sentencing guidelines, and the need to avoid unwarranted sentencing disparities. 18 U.S.C. §3553(a)(1), (4) and (6).

### The Guidelines

A district court should begin all sentencing proceedings by calculating the applicable Guidelines range. Gall v. United States, 552 U.S. 38, 49 (2007). The Guidelines provide the "starting point and the initial benchmark" for sentencing. Id.

### The Role Enhancement

According to Probation, the total offense level is 16, which includes a 4-level role enhancement as per USSG §3B1.1(a) (PSR at ¶¶67-76). The role enhancement should not apply for two reasons.

First, Mr. Danskoi did not organize or lead anyone in the criminal activity at issue, to wit, CS's fraudulent asylum

Hon. J. Paul Oetken
United States District Judge
September 14, 2023
Page 9

application. At worst, Mr. Danskoi knew that CS was straight but connected him anyway to Lysyuchenko, to whom he sent all asylum clients, to draft an application and supporting affidavit, and to Greenberg who represented him at his asylum interview. It cannot fairly be said that Mr. Danskoi organized or led either woman.

Lysyuchenko, an independent contractor, had worked with Mosha before Mr. Danskoi was involved in asylum work and had been freelancing at a set hourly rate for Mr. Danskoi consistently for some time, with the belief that he did not peddle fictive asylum applications. Further, there was no evidence that Mr. Danskoi told her that he knew CS was straight. Greenberg was an independent lawyer. Mr. Danskoi did not organize or lead her. Indeed, Mr. Danskoi did not even want to refer CS to her, believing CS would fare better at the interview on his own. And, as with Lysyuchenko, there was no evidence that Mr. Danskoi told Greenberg that he knew CS was straight. In this regard, recall that Greenberg had not even read the filed application when she first met CS in her office and according to CS was visibly taken aback to then learn the basis of the alleged persecution (231-32). It merits noting also that "titles such as 'kingpin' or 'boss' are not controlling" in role enhancement determinations, USSG §3B1.1, App. Note 4, and though Mr. Danskoi may have had nominal positions in RA on paper, it remains, even despite the verdict that he conspired with one or both, that he did not lead Lysyuchenko or Greenberg in the criminal activity at issue.

Second, the criminal activity did not involve five or more participants and was not otherwise extensive. As set forth above, at most, there were two participants other than Mr. Danskoi, for a total of three. Furthermore, it was not "otherwise extensive" as the offense resulted from a sting operation and there were no other unwitting participants who provided services or otherwise contributed to the offense.

Hon. J. Paul Oetken
United States District Judge
September 14, 2023
Page 10

### The Government's Suggested Obstruction Enhancement

The government claims that a 2-level enhancement for obstruction of justice should apply as per USSG §3C1.1 essentially because Mr. Danskoi testified at trial and lost (PSR at ¶¶63-64). It notes specifically that CS told Mr. Danskoi that he was "not gay." This needs context.

The statement at issue was made during Mr. Danskoi's third meeting with CS. In the first meeting, CS indicated that he was 52 years old, never married and had no children. CS explained that he no longer had "status" in the United States but he could not return to Ukraine because of some unspecified unlawful behavior. Mr. Danskoi suggested that CS file for political asylum and then listed the possible bases of persecution, including membership in a particular social group. He did not identify sexual preference as a social group. Alternatively, Mr. Danskoi suggested, CS could get married. In this regard, he made clear that RA would not help CS to find a mate, woman or man. He testified that he mentioned a possible "groom" because it appeared to him that homosexuality might be the vague "unlawful behavior" CS was referring to. A second meeting followed. Again, Mr. Danskoi did not mention sexual preference, or homosexuality, as a basis for asylum. He merely instructed CS that he would have to write his own story and Mr. Danskoi would provide a specialist (i.e. Lysyuchenko) to go over it.

Out of the blue at the third meeting, CS said that he wanted to pursue asylum based on sexual preference, confirming at least some inkling Mr. Danskoi had at the first meeting. The conversation drifted a bit before CS blurted out that he was "not gay." As he did so, however, and as Mr. Danskoi testified, he fidgeted in his chair nervously, which suggested to Mr. Danskoi that CS, with no wife or children, was deeply closeted and had some "complex" involving limited vocabulary, embarrassment and shyness. It must be conceded that the jury was not persuaded but there is nothing out-and-out perjurious about the testimony. Had Mr. Danskoi denied that the "not gay" statement was made, sure, but here he merely explained his view of the events that transpired. Had Mr. Danskoi testified contrary to a prior confession or some other out-of-court statement, sure, but there were no such statements. The §3C1.1 enhancement "is not intended to punish a defendant for the exercise of a constitutional right." App. Note 2.

### The Appropriate Guidelines Calculation

Based on the foregoing, the total offense level should be 12, in Zone C (allowing for a split sentence). Mr. Danskoi has zero criminal history points and is in criminal history category I, which carries a range of imprisonment of 10-16 months.

Under a proposed amendment to USSG §4C1.1, expected to go into effect in November 2023, based on the lack of criminal history points, Mr. Danskoi would receive a 2-level reduction in his offense level. A total offense level of 10, in Zone B, with a corresponding range of imprisonment (or probation with a confinement condition such as home detention) of 6-12 months would apply.

### The Nature and Circumstances of the Offense

To be sure, a conspiracy to defraud the government (and specifically USCIS) is a serious offense. I note, however, that Mr. Danskoi is not subject to any specific offense characteristics under USSG §2C1.1 (the guideline applied) or USSG §2L2.2 (the alternative guideline not used because it carries a lower base offense level). That is to say, the offense here did not involve a bribe or extortion, it did not involve repeated efforts (this was a one-off), it was not committed to facilitate some other felony, and Mr. Danskoi has no history of immigration fraud. The fact that there are no applicable specific offense characteristic enhancements suggests that while this is a serious offense, Mr. Danskoi is among the lowest level of immigration fraud offenders.

### The History and Characteristics of the Defendant

Mr. Danskoi has no prior criminal history and has led an exemplary life. For his part in the opposition and passive protests to the repressive, autocratic regime, he was twice imprisoned in Belarus, once for nearly a year, and tortured. He was forced to flee his native land, leaving his beloved father behind, to find a new life in this Country. Here, he has embraced the American Dream. Despite obvious language barriers, he has been steadily employed and continues to work to provide for his wife and son (he even sends money to his ex-wife when he can). Unlike the vast majority of offenders before the Court, his drive is unhampered by mental health- or drug- or alcohol-related problems. Further as to his sterling character, I refer the Court to the

Hon. J. Paul Oetken
United States District Judge
September 14, 2023
Page 12

attached letters and especially that of his son, Pavel.

<u>The Need to Avoid Unwarranted Sentencing Disparity</u>

Defendants already sentenced in this matter have received terms of imprisonment of 10 months (Mosha), 3 months (Greenberg) and 2 months (Lysyuchenko). All were sentenced below the guideline range. All were involved in more than one false application. While Mosha's term falls within the national and Second Circuit averages according to the latest United States Sentencing Commission figures, the other two terms are below (FY 2022, Table 7, national mean and median terms of 12 months and 8 months, Second Circuit mean and median terms of 12 months and 6 months).

While recognizing that defendants present with different personal histories, it is hard to believe that Mr. Danskoi's personal history is not among the most sympathetic and compelling, and given the other variances, including a significant one for Greenberg, Mr. Danskoi (who was involved in only one false application), too, should benefit from a downward variance to avoid unwarranted sentencing disparity for similarly situated defendants. <u>See</u> 18 U.S.C. §3553(a)(6).

<u>The Parsimony Clause</u>

Having considered the above, a sentence of time served with a term of supervised release will reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense, especially as any sentence carries terrible collateral consequences here. As noted, Mr. Danskoi will very likely be removed from this Country (forced to leave his wife and son and his employment) and returned to Belarus and the uncertainty of what may happen to him there (imprisonment, torture (again)?). See, e.g., Human Rights Watch, Belarus: Decree Puts Exiled Citizens At Risk, 09/08/23 (new rules require exiled Belarusians to return for issuance, replacements and extensions of passports and ID cards placing those at risk of arrest and political persecution; "[p]olitically motivated repression against large segments of the population . . . shows no signs of diminishing[, t]he current number of detainees, imprisoned for political reasons is estimated to be as high as $1,500"). Further, even were he not removable, a term of imprisonment such as Greenberg's or Lysyuchenko's for Mr. Danskoi would result in the certain loss of his job with PNK Group ($50,000 per year) and spell ruin for the Internet businesses that

his wife cannot operate alone.

Given the extreme collateral consequences present here, a further term of imprisonment is not necessary to deter criminal conduct. Nor is further imprisonment necessary to protect the public. Mr. Danskoi is no longer in the business of assisting recent immigrants and has no other criminal record. I note also that Mr. Danskoi is in his late 50s. As to that age group, "the recidivism rate of older offenders was less than half that of offenders under age 50"; "as offenders' age at sentencing increased, recidivism rates decreased"; "recidivism events for older offenders were less serious, compared to offenders under the age of 50"; and "older offenders take a longer time to recidivate, compared to their younger peers." United States Sentencing Commission, <u>Older Offenders in the Federal System</u>, July 2022, at 5, key point 7. Statistically, Mr. Danskoi has aged out. Finally, Mr. Danskoi is not in need of any treatment that a correctional facility can provide. He is highly educated, well employed and provides for his own specialized health needs.

## CONCLUSION

For the foregoing reasons, a downward variance should issue and Mr. Danskoi should be sentenced to time served, a term of supervised release, and a $100 special assessment.

Respectfully submitted,

James M. Branden

Encs.

Hello!

My name is Pavel Danskoi, and I am the son of Uladzimir Danskoi. I would like to briefly tell you about my father, who is currently not just my father, but also someone who has always set a good example for me and has been my closest friend. My father came to the United States not to break the law. He came here to live and work honestly, to become a U.S. citizen, to participate in elections and the political life of this country, and to freely travel the world with his family. We often talked about this. He always taught me to be honest and fair towards others. He used to tell me, "Treat others as you would want them to treat you!" He followed the same principle in his work. Personally, I know many of his clients who worked with him, and not a single one has spoken poorly of him. I am certain that he worked honestly with all of his clients and never taught them to deceive.

My father is a kind and compassionate person. He loves his family and close ones dearly. He talks to his father, my grandfather, who lives in the Republic of Belarus and is turning 90 this year, almost every day on the phone. Whenever my dad had the chance, he would go to the EU to visit him every year. He also maintains constant communication with his daughter, my elder sister, who lives in Cyprus. Last year, when she got married, he was deeply saddened that he couldn't be there to congratulate her. Despite not being the most affluent person, my father has always helped and continues to help our entire family financially, even my mother, from whom he has been divorced for a while.

Moreover, my father started sending donations to the Ukrainian army after Russia's invasion of Ukraine. Talking to him, I see how he's distressed about the events of the past two years in his life. He endured arrest, spent several days in jail, and was under house arrest for several months. Most importantly, he wasn't able to meet his loved ones who can't come to the U.S. But I support my father and will continue to do so because I believe in him, just as he believes in me. He provided me with opportunities in life, and based on his advice, I decided to serve in the U.S. Army.

My father is not a criminal, and he never was. I sincerely hope for your fair judgment.

Respectfully,
Pavel Danskoi

Avshalum Rafailov
65 Medford Rd
Staten Island, NY 10304
917-620-2123

August 23rd, 2023

Re: Uladzimir Danskoi

To whom it may concern:

I, Avshalum Rafailov, have known Mr. Uladzimir Danskoi as a good person and neighbor for over 8 years. Mr. Danskoi is a reliable, responsible, and trustworthy tenant of my house at 188 Hett Ave, Staten Island NY 10306. He has always paid his rent in a timely manner and kept his house in clean and proper condition. I am pleased to have him as our tenant and hopefully, will continue to have him as such for years to come.
On a personal level, Mr. Danskoi is a respectful, attentive, and family oriented person. There have been no complaints raised against his behavior from our neighbors and he is an upstanding member in the neighborhood.
I was surprised to hear about his case as he has always been a rather solid person. It is for this reason I am writing this letter of reference for Mr. Uladzimir Danskoi regarding this matter.

Thank you.
Avshalum Rafailov

To whom it may concern,

Hello, my name is Pavel Shinkarev. My family and I live at the address 190 Hett Avenue and I work as Oiler for NYC DEP.

I've known Uladzimir Danskoi for 9 years. We met when he and his family started to renovate the apartment next to my house.

Over the last 9 years, I never had any conflicts or issues with Uladzimir. I consider him an honest, respectful, and very tactical person. My neighbor continues to keep his property clean and orderly despite only being a renter.

Even my mother, who is known to be very strict with her circle of friends and acquaintances, keeps in contact with Uladzimir. When Uladzimir and his wife leave for vacation, they leave their keys to my mother and she happily looks after their dog and waters their plants.

From my 9 years of interaction with Uladzimir, I am certain that he is a trustworthy and well-mannered person. I do not have much knowledge of any of Uladzimir's accusations as he does not speak extensively on that topic. Despite the situation, I'm very certain that jail will not improve Uladzimir as a person. This is why I'd like to turn to you, the jury, to not advocate for imprisonment. I ask you all, please do not ruin somebody's life.

Respectfully,
Pavel Shinkarev

Date: September 1, 2023