

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 21, 2023

**BY ECF**
The Honorable J. Paul Oetken
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

**Re:** *United States* **v.** *Uladzimir Danskoi*, S1 21 Cr. 92 (JPO)

Dear Judge Oetken:

The defendant in this case, Uladzimir Danskoi ("Danskoi" or "the defendant"), is scheduled to be sentenced on September 28, 2023, at 11:00 a.m., having been convicted, after trial, of Count One of Superseding Indictment S1 21 Cr. 92 (JPO) (the "Indictment"), which charged Danskoi with conspiring to defraud the United States and to commit immigration fraud, in violation of Title 18, United States Code, Section 371. The Government respectfully submits this memorandum in connection with that sentencing and in response to the defendant's sentencing memorandum (Dkt. No. 289) ("Def. Mem.").

Over the course of several years, with incriminating messages with his partner and co-defendant Yury Mosha beginning in 2016 and his conduct with CS-3 continuing until the end of 2020, the defendant, an experienced immigration practitioner who ran Russian America's Brooklyn office, disregarded the law and helped make a mockery of the U.S. immigration system by conspiring to defraud the United States and commit asylum and visa fraud. As someone who personally benefited from the asylum system, which allowed him to remain in the United States after his tourist visa expired, Danskoi's years-long fraud is especially troubling.

At trial, Danskoi did not hesitate to thumb his nose at our judicial system, lying under oath and repeatedly giving obstructive, non-responsive answers to simple questions. Even after the jury saw through his perjurious testimony, Danskoi still refuses to accept responsibility, doubling down on his incredible defense that he did not conspire to commit fraud during his dealings with CS-3. Factoring in Danskoi's leadership role and this obstructive conduct, the defendant faces a United States Sentencing Guidelines' ("U.S.S.G" or "Guidelines") range of 27 to 33 months'

imprisonment (the "Guidelines Range").[1]  The U.S. Probation Office recommends a sentence of 21 months' imprisonment.

For the reasons below, the Government submits that a significant incarceratory sentence along the lines of the 21-month sentence recommended by the U.S. Probation Office but below the Guidelines Range of 27 to 33 months', is appropriate in this case.

## Background

**Background on the Asylum Process**

As the Court is well aware from Danskoi's trial and the Court's stewardship of this case, pursuant to federal immigration law, to obtain asylum in the United States, an alien is required to show that he or she has suffered persecution in his or her country of origin on account of race, religion, nationality, political opinion, or membership in a particular social group, or has a well-founded fear of persecution if he or she were to return to such country.

Alien applicants seeking asylum are required to complete and present a form, Form I-589, to United States Citizenship and Immigration Services ("USCIS").  The Form I-589 requires a detailed and specific account of the basis of the asylum claim.  Alien applicants are permitted to append to the Form I-589 an Asylum Affidavit—a personal history statement, providing greater detail about the applicant's background and basis for seeking asylum.  Applicants are further entitled to include relevant documentation supporting their claim for asylum.  If the Form I-589 is prepared by someone other than the applicant or a relative of the applicant, such as an attorney, the preparer is required to set forth his or her name and address on the form.  The alien applicant and preparer are required to sign the petition under penalty of perjury.  The alien applicant must typically apply for asylum within one year of his or her arrival in the United States.

After the Form I-589 is submitted, the alien applicant is interviewed by an Asylum Officer to determine whether the applicant qualifies for asylum (the "Asylum Interview").  At the Asylum Interview, the applicant is permitted to speak on his or her own behalf, and can present witnesses or documentation in support of his or her asylum claim.  Asylum applicants are entitled to have an immigration lawyer present for their Asylum Interview, and often avail themselves of this right.  At the conclusion of the Asylum Interview, the attorney is usually given an opportunity to provide supplemental or clarifying information, to make a statement on behalf of the applicant, and/or to answer questions or concerns posed by the Asylum Officer.  After the Asylum Interview, the Asylum Officer determines whether the alien applicant qualifies for asylum.

If an alien applicant is granted asylum, he or she receives a completed Form I-94 that reflects that USCIS has granted him or her asylum status.  The grant of asylum typically applies

---

[1] Danskoi does not, and will not, benefit from the proposed amendment to U.S.S.G. § 4C1.1 that is expected to go into effect in November 2023, which would provide a decrease of 2 levels for certain offenders, but not Danskoi, with zero Criminal History points.  Danskoi does not fall within the coverage of the amended guideline because he receives an adjustment under §3B1.1 (Aggravating Role).

Hon. J. Paul Oetken                                                                                           Page 3
September 21, 2023

to the applicant's spouse and children as well.  An alien who has a Form I-94 can apply for, among other things, lawful permanent resident status.  A grant of asylum status does not expire, although USCIS can terminate asylum status if, among other things, it is later discovered that the applicant obtained asylum through fraud or no longer has a well-founded fear of persecution in his or her home country.

If the Asylum Officer determines that the applicant is ineligible for asylum status, and if the applicant is in the United States illegally, the matter is referred to an Immigration Judge at the Executive Office for Immigration Review.  The Immigration Judge holds a hearing during which the alien applicant, and commonly an immigration lawyer, appear before the Immigration Judge and present evidence in support of the asylum application (the "Asylum Hearing").  For asylum applicants residing in the Southern and Eastern Districts of New York, all immigration hearings take place in Manhattan, New York.  After the Asylum Hearing, the Immigration Judge renders a decision on the alien's asylum application.[2]  If the Immigration Judge denies the asylum application, the applicant may appeal that decision to the Board of Immigration Appeals ("BIA").  If the applicant loses his or her appeal before the BIA, the applicant may appeal to a federal court.

A successful application for asylum generally requires, among other things, that: (a) the applicant submit his or her application within one year of his or her last arrival in the United States; (b) the applicant demonstrate that he or she is a "refugee," meaning, in general terms, that he or she is unable to return to his or her country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion; (c) the applicant subscribe to the assertions contained in his or her application for asylum under penalty of perjury; and (d) the applicant be interviewed, under oath, by an asylum officer.

**Investigation Into Russian America**

The investigation revealed that Danskoi, his co-defendants—including his partner Yury Mosha, Julia Greenberg, Aleksei Kmit, Kateryna Lysyuchenko, Tymur Shcherbyna—and others, known and unknown, conspired to provide certain applicants and potential applicants for legal status with assistance in making and supporting fraudulent claims for asylum, including through Form I-589s, Asylum Affidavits, Supporting Documents, Asylum Interviews, and Asylum Hearings, with the objective of receiving a completed Form I-94.  Among other things, they helped applicants and potential applicants to (i) concoct false and fraudulent bases that would purport to satisfy the above-mentioned criteria for asylum, (ii) generate fraudulent evidence that purported to support those false and fraudulent assertions, (iii) prepare and submit Asylum Applications, Asylum Affidavits, and Supporting Documents containing the false and fraudulent assertions, and

---

[2] Because the determination of the legitimacy of an asylum applicant's "application" includes both an assessment of the written Form I-589 as well as the applicant's performance in a subsequent Asylum Interview and/or Asylum Hearing, references herein to the "asylum application" (or "application") refer to the combination of the Form I-589 and in-person proceedings (*i.e.*, Interview and Hearing). References to the "Form I-589," the "Asylum Affidavit," and/or "Supporting Documents," on the other hand, will exclusively relate to the applicant's written submission(s) to USCIS.

Hon. J. Paul Oetken                                                                                              Page 4
September 21, 2023

(iv) prepare for Asylum Interviews and Asylum Hearings at which the applicant would reiterate the false and fraudulent assertions and at times be accompanied by an attorney. Danskoi and Mosha also discussed ways in which they could fabricate applicants' bases for procuring L1 visas, which are certain visas permitting aliens to work in this country.

The investigation into the defendants was prompted, in part, by several sources who collectively informed the investigating agencies—the Federal Bureau of Investigation ("FBI"), the Department of Homeland Security-Homeland Security Investigations ("HSI"), and USCIS—that both Danskoi and Mosha, who ran Russian America's Brooklyn Office and Manhattan Office, respectively, were engaged in immigration fraud. The investigation included the use of a cooperating witness ("CS-1") and two confidential sources (referenced in the Indictment as "CS-2" and "CS-3") (collectively, the "Confidential Informants" or "Sources") who, at the instruction of law enforcement, conducted a sting investigation into the defendants and their associates. As part of that investigation, CS-1 and CS-2 each worked with Mosha and Mosha's associates at the Manhattan Office, and CS-3 worked with Danskoi at the Brooklyn Office; both CS-1 and CS-3 also ultimately worked with Lysyuchenko and Greenberg.

The Sources each presented themselves as aliens who were visiting the United States on travel visas, but each looking to live here permanently without any valid legal basis to do so. In each case, one or more of the defendants encouraged the Sources or assisted them in concocting and/or presenting false bases for asylum, through the written Form I-589 application and supporting Asylum Affidavit and documentation and/or in advance of and during the Sources' Asylum Interviews with a USCIS Asylum Officer.

**CS-1**

In August 2018, CS-1 called Danskoi and asked to speak to Mosha. Danskoi referred to Mosha as his "partner" and noted that CS-1 "can work with me regarding this or you can reach out to [Mosha]. I can give his contact. It's on the website." (GX 202-T at 2). CS-1 would go on to work with Mosha, Lysyuchenko, Kmit, Shcherbyna, and Greenberg and ultimately submit a wholly fraudulent asylum claim, attend an Asylum Interview, and then an initial appearance in immigration court at 26 Federal Plaza after the fraudulent asylum application was denied.

**CS-3**

Starting in August 2019, CS-3 began working with Danskoi at Russian America's Brooklyn Office. CS-3 held himself out as a Ukrainian national looking to stay in the United States permanently, but without any legal basis to do so. Before CS-3 presented any evidence that he had been (or would be) persecuted if he returned to Ukraine, Danskoi *sua sponte* suggested that CS-3 seek asylum based on political opinion ("Well, as I told you, in terms of price and quality, political asylum is, of course, the best option."). (GX 105-T). Danskoi also advised that by simply filing an asylum claim, CS-3 would buy himself several years to remain in the United States, during which time he could get married to an American woman, providing him with a viable basis to remain in the United States permanently ("[B]y submitting a case, this is what I'm talking about, the case can be considered, they can invite you for an interview in three months, or maybe in five years. . . . But all this time you will have been here legally, you have a status, a work permit, social

[security], all this is being extended . . . And if at some stage you are successful, well, you aren't successful, but change your marital status, so get married . . . If you get married, you can close the political [asylum] case and apply for family reunification.").

Thereafter, during a recorded meeting on September 18, 2019, Danskoi and CS-3 agreed to change CS-3's basis for asylum by instead claiming that CS-3 was a gay male who would be persecuted for his sexual orientation if he returned to Ukraine. Danskoi did so despite CS-3 in the very same meeting explicitly advising Danskoi that "I'm not gay." Danskoi advised that seeking asylum based on sexual orientation would be far easier than with political opinion ("Sexual minorities. As for priorities, this is the direction . . . There they don't even ask for evidence, evidence of persecution. Because in political [asylum] they say "Who persecuted you, why, how did it appear, were you detained, how do you know in general that you were persecuted?' In this case [*i.e.*, sexual orientation] so you do not need to say that you were caught or beaten." (GX 111-T)). Danskoi advised that the trick for CS-3 would be convincing Asylum Officers that he was gay ("But it will just be necessary, and this is the difficulty, to convince them that you belong to this group. . . . There is no need to prove it with some example, but they look at a person, how you talk, how you behave . . . If they believe you, then the questions will disappear." (*Id.*)).

During the same meeting, Danskoi advised CS-3 how to frame his asylum claim, including by instructing CS-3 to claim that CS-3 only discovered that he was gay after moving to the United States, since this would allow CS-3 to avoid fabricating incidents of historical persecution; Danskoi advised that this would also allow CS-3 to explain why he was first seeking asylum well over a year after he had been living in the United States.[3] Danskoi provided this guidance without having any basis to believe that CS-3 was gay or that CS-3 first "discovered" that he was gay after arriving in the United States. Danskoi also suggested that CS-3 wear an earring to his Asylum Interview, in an attempt to have CS-3's appearance comport with Danskoi's view of a gay male. In subsequent meetings, Danskoi coached CS-3 how to write CS-3's fraudulent Asylum Affidavit.

Danskoi also put CS-3 in touch with Lysyuchenko to help CS-3 craft his Asylum Affidavit. CS-3 repeatedly advised Lysyuchenko that CS-3 was not actually gay. However, much like with CS-1, Lysyuchenko nevertheless agreed to help CS-3. Among other things, Lysyuchenko sent CS-3 Asylum Affidavit templates—including multiple templates for gay males claiming persecution based on sexual orientation—to use as a model. Thereafter, CS-3 sent various iterations of his Asylum Affidavit to Lysyuchenko. The affidavit fabricated a personal history in which CS-3 claimed that he realized he was gay as a child living in Ukraine, and that CS-3 had sexual encounters in camp (with an adult wrestling coach) and school (with a boyfriend). The draft affidavits also detailed an event in which CS-3 and his "first boyfriend" were attacked by about four to five homophobic males (the "Alleged Boyfriend Assault"). Regarding the Alleged Boyfriend Assault, CS-3 claims that he was "pushed and shoved" but able to "fight them off" given his wrestling background. When Lysyuchenko provided feedback, CS-3 reiterated that these incidents were fabricated, including by asking whether CS-3 should fabricate "[n]ames of the fictitious coach and boyfriend." Lysyuchenko also advised CS-3 to include certain information in his Affidavit, including by describing his alleged feelings about being a gay male in Ukraine.

---

[3] Except in exceptional circumstances, asylum applications are required to be submitted to USCIS within the first year of an alien-applicant's arrival in the United States.

When CS-3 indicated that "[i]t is very difficult for me to understand this situation because I have never actually been gay, because I do not understand their feelings," (GX 327-T), Lysyuchenko agreed to (and did) send CS-3 three additional sample affidavits of asylum applicants claiming persecution on grounds of sexual orientation.

When CS-3 subsequently complained to Danskoi that Lysyuchenko was encouraging CS-3 to express his "feelings" about being a gay male—a matter about which CS-3 had no actual experience—Danskoi coached CS-3 how to frame his Asylum Affidavit: "Look, to make it easier, I, like, will prompt you, give you pointers. To you . . . the point is that your life there [in Ukraine] has become, like unbearable for you for some reason . . . That such an atmosphere was created around you that when you arrived here, it's like you came to another world, where absolutely no one gives a damn, they don't care and there, that's all, it became, to get even more serious. And some threats even began, some kind of reprisals, there. So you can write almost anything you want. They warned me, they said 'If you show up again . . . You should not step a foot in the bathhouse.'"

Thereafter, Danskoi submitted CS-3's Form I-589 claiming persecution based on sexual orientation. Appended to the I-589 was CS-3's affidavit, which contained multiple material misrepresentations, including (1) that CS-3 knew he was gay since he was a child; (2) at age 15, CS-3 had a romantic encounter with his male wrestling coach in Ukraine; (3) that while in college, CS-3 was assaulted after flirting with another man that CS-3 mistakenly believed was also gay; and (4) the details of the fabricated Alleged Boyfriend Assault. Notably, CS-3 did not prepare his I-589 himself, nor did he prepare the final version of his Asylum Affidavit. (It is believed that Lysyuchenko prepared these documents because, among other reasons, Danskoi does not fluently speak, read, or write English.) Nevertheless, the "Preparer" section of the Form I-589 Application (which requires the individual who prepared the application to identify himself/herself and swear that the information contained in the Application is accurate to the best of the preparer's knowledge) was left completely blank. Danskoi did, however, sign a notarized statement that he is fluent in both Russian and English (which he is not) and that he personally translated CS-3's Affidavit from Russian to English (which he did not). (GX 305).

In or around November 2020, Danskoi introduced CS-3 to Greenberg, so that she could help CS-3 prepare for, and represent CS-3 at, CS-3's Asylum Interview. Thereafter, from November up to and including December 2020, CS-3 began meeting with Greenberg, who helped prepare CS-3 to defraud USCIS. For example, during their initial meeting—at which CS-3 paid Greenberg $1,500 to prepare CS-3 for and represent CS-3 during his Asylum Interview—Greenberg told CS-3 that he did not appear to be gay, and that she would need several meetings to review, rehearse, and coach CS-3 through his asylum story. She also advised CS-3 to change his appearance for the Asylum Interview to comport with her own view of a gay male, including by dressing completely differently than he had dressed to their initial meeting, and suggesting that CS-3 wear a colorful jacket and a blouse-like shirt. During this meeting, CS-3 also informed Greenberg that Danskoi was largely responsible for CS-3's false asylum claim. For example:

> GREENBERG: Good so I have your story. Vladimir sent it to me. And what else do we have from the evidence base, do we have anything?

| | | |
|---|---|---|
| CS-3: | | Well, what Vladimir [Danskoi] left in my head. |
| GREENBERG: | | Only in the head, that is, there are no documents? |
| CS-3: | | No. |
| GREENBERG: | | What he wrote to me, that's the way it is . . . Well, basically, I learned it by heart. |

            *    *    *

| | | |
|---|---|---|
| GREENBERG: | | Ooooh… You are going it as a gay |
| CS-3: | | Of course, I wouldn't want to. They said it is better that way. |

(GX 133-T).

  During a subsequent December 9, 2020 meeting, Greenberg indicated that CS-3 was not ready for his asylum interview, that his answers were not believable ("There are no gays who are ashamed of their orientation. There are no gays who change their orientation."). (GX 140-T). She also explicitly expressed her awareness that CS-3 was lying about his asylum claim, and that the Asylum Officer would also detect this if CS-3 did not better prepare for his interview ("I want to tell you that both I and the officer, we roughly imagine when a person is lying.") (*Id.*). During that same meeting, Greenberg again indicated that CS-3 did not appear to be gay, and again advised CS-3 how to dress for his Asylum Interview ("So you must definitely have a scarf . . . you must have dress shoes in some non-standard…non-standard color . . . if you put on a shirt like I'm wearing now with a scarf on top . . . you can do this one, a see-through one . . .and put on some kind of bright colors") and Greenberg instructed CS-3 to "pluck your eyebrows and get a manicure." (*Id.*).

  During this same meeting, CS-3 explicitly advised Greenberg that certain critical information in his Asylum Affidavit was fabricated. For example, the affidavit largely focused on the fact that CS-3 was a wrestler in school, that his first gay sexual encounter was with a male wrestling coach, and that, while in college, CS-3's wrestling skills allowed CS-3 to stave-off an alleged attack upon CS-3 and his boyfriend in Ukraine. Yet during the meeting, CS-3 explicitly informed Greenberg that Lysyuchenko fabricated the portion of his Asylum Affidavit involving wrestling: "I did not wrestle. I already said this. This is how she wrote it . . . This is what Katya thought up. . . . I never wrestled." Nevertheless, Greenberg continued to prepare CS-3 to present and defend these falsehoods during his Asylum Interview.

  During a subsequent December 21, 2020 Asylum interview prep session, Greenberg coached CS-3 how to answer certain questions, even telling CS-3 how to feel about "realizing" that CS-3 was gay:

| | | |
|---|---|---|
| <u>GREENBERG</u>: | | And after that relationship. What did you feel? |

| | | |
|---|---|---|
| CS-3: | | I felt that I was drawn to boys. But mostly I wanted to hide it all because it wasn't normal. |
| JG: | | You had fear. |

(GX 142-T). Greenberg also coached CS-3 how to express his attraction toward his first boyfriend, despite CS-3 never expressing these emotions himself ("You started to get butterflies . . . There was some kind of burning sensation.") (*Id.*). Much as with CS-1, Greenberg also coached CS-3 to claim during his asylum interview that Russian America merely provided translation services ("Yes, there is such a company, Russian America, they help with translations.") (*Id.*).

**Arrest and Additional Evidence**

Danskoi, Mosha, and Kmit were each arrested at their respective homes on or around February 18, 2021. Greenberg was arrested on the same date while vacationing in Breckenridge, Colorado. Lysyuchenko, who was arrested in Italy and was extradited to the United States. Shcherbyna remains at-large.

**Danskoi's Visa Fraud Communications With Mosha**

During Mosha's arrest, the FBI recovered and conducted consent searches of several of Mosha's phones.[4] The collective searches of those phones revealed, among other things, that Mosha had been engaged in regular communications with both Danskoi and Greenberg about various shared clients in the years leading up to the defendants' arrests. In at least two situations, Danskoi and Mosha explicitly discussed generating fake lease agreements and other documents to help certain unknown clients obtain L1 visas in this country on fraudulent pretenses. Specifically, in July 2018, the two discussed staging an office to look like an automobile shop, to make it appear as though a particular visa applicant had a job waiting for him in the United States; in exchange, Danskoi and Mosha would receive $900. (GX 580-62-T). Similarly, in January 2019, the two discussed staging an office to look like a cosmetics store and preparing "a fake lease" to help another client obtain an L1 employment visa. (*Id.*).

On other occasions, Mosha relayed instances in which shared clients claimed that Danskoi was committing fraud. For example, on October 31, 2017, Mosha sent Danskoi a text in which a client complained "This Mosh[a] also has colleagues. One of them is called Vladimir, whom I encountered and thank GOD, we didn't move forward after the phone call . . . Vladimir told me that the story of my case can be embellished and invented …. No lawyer will say this." (GX 580-61-T).

Other messages showed how the two would steer clients toward pursuing asylum, even when they apparently had not yet provided any evidence that they were persecuted or qualified for it. For example, on December 20, 2016, Danskoi texted Mosha about a client, apparently named

---

[4] The FBI had also previously surreptitiously searched one of Mosha's phones, pursuant to a judicially authorized warrant, following Mosha's arrival at John F. Kennedy Airport from an international location.

"Ruslan" who wanted to pursue an H-2B employment visa. Mosha responded that Danskoi should instead "[s]ell [him] political [asylum] . . . Its hard to get an employment visa" to which Danskoi responded "I will sell it." (GX 580-61-T).

Other independent records also establish Dankoi's longstanding relationship with Mosha and Russian America, including Russian America corporate bank records held at Bank of America, and New York State Department of State records detailing Danskoi's and Mosha's roles as principals in the company. The two also maintained a Russian America website in which Mosha's and Danskoi's names and phone numbers were listed.

## Trial

On December 5, 2023, Greenberg and Danskoi proceeded to trial. The Government's direct case lasted approximately six days, and included extensive testimony from CS-1, CS-3, two representatives from USCIS, and an FBI Special Agent, who testified about Greenberg's post-arrest confession. Danskoi and Greenberg testified in their own defense. On the afternoon of December 17, 2022, the jury convicted Danskoi and Greenberg of Count One, after deliberating for approximately one full day.

## Guidelines Calculation

**Base Offense Level**

Probation correctly calculates that, pursuant to U.S.S.G. §§ 2X1.1, 2L2.1, and 2C1.1, the base offense level is 12. (PSR ¶ 68).

**The 4-Point Role Adjustment Applies**

Probation also correctly assesses that a 4-level adjustment is appropriate, pursuant to U.S.S.G. § 3B1.1(a), because the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. (PSR ¶ 71). This enhancement is appropriate where the defendant "played a crucial role in the planning, coordination, and implementation of a criminal scheme." *United States v. Paccione*, 202 F.3d 622, 624 (2d Cir. 2000). The Government must prove by a preponderance of the evidence that a defendant qualifies for a role enhancement. *See United States v. Molina*, 356 F.3d 269, 274 (2d Cir. 2004). "[A] sentencing court, like a jury, may base its factfinding on circumstantial evidence and on reasonable inferences drawn therefrom." *United States v. Gaskin*, 364 F.3d 438, 464 (2d Cir. 2004).

As Probation rightly points out, "The defendant was an organizer or leader of the criminal activity, which involved five and more participants and was otherwise extensive. Specifically, Danskoi operated and maintained one of two office locations for a immigration firm, which included, amongst others, the participation of a journalist, a blogger, a translator and attorneys, in furtherance of the offense. Thus, pursuant to §3B1.1(a), a four-level increase is warranted." (*Id.*). Indeed, that Danskoi was an organizer or leader is made plain by (a) his conduct (whereby he decided who to refer CS-3 to, including Lysyuchenko and Greenberg, and was a principal of Russian America who ran its Brooklyn Office), (b) the formal corporate paperwork (where

Danskoi was listed as the CEO on Department of State Records and the head of the Brooklyn Office on the Russian America website), and (c) his own words to CS-1 that he was Mosha's "partner."

As for whether the criminal activity involved five or more participants or was otherwise extensive, Section 3B1.1 of the Guidelines instructs district courts to increase a defendant's offense level by four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). The evidence at trial easily established that there were more than five participants and, in any event, that the criminal activity was otherwise extensive.

A "participant" is anyone "criminally responsible for the commission of the offense," regardless of whether that person has been charged or convicted. *See* U.S.S.G. § 3B1.1 cmt. 1. "In assessing whether a criminal activity 'involved five or more participants,' only knowing participants are included." *Paccione*, 202 F.3d at 624. As a threshold matter, "[t]he defendant himself is to be counted as one of the participants." *United States v. Norman*, 776 F.3d 67, 82 (2d Cir. 2015) (citing *Paccione*, 202 F.3d at 625). The Government therefore must identify only four other participants in Danskoi's scheme in order to satisfy the requirements of § 3B1.1(a). The Court need look no further than the named defendants Mosha, Greenberg, Lysyuchenko, Shcherbyna, and Kmit, much less the multiple other attorneys and the interpreter ("A.T.") covered at trial, (*see* Trial Tr. 699 (additional attorneys), 1398 (rebuttal summation discussing A.T.)), to see that there were easily five or more participants.

Moreover, even if the criminal activity somehow did not involve five participants, a four-level enhancement pursuant to U.S.S.G. § 3B1.1(a) would be alternatively appropriate because Danskoi was a leader or organizer and the criminal activity was "otherwise extensive" within the meaning of § 3B1.1. In considering whether an offense was "otherwise extensive," courts ask "whether the criminal scheme was the 'functional equivalent' of a scheme involving five or more knowing participants." *United States v. Manas*, 272 F.3d 159, 166 (2d Cir. 2001). In assessing functional equivalence, courts consider: "(i) the number of knowing participants; (ii) the number of unknowing participants whose activities were organized or led by the defendant with specific criminal intent; [and] (iii) the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme." *Id.* (citing *United States v. Carrozzella*, 105 F.3d 796, 803-04 (2d Cir. 1997)); *see also United States v. Bennett*, 252 F.3d 559, 566 (2d Cir. 2001) (fraud involving the "unknowing services of many outsiders" is otherwise extensive). "[A]ll persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." U.S.S.G. § 3B1.1, cmt. n.3; *see also Carrozzella*, 105 F.3d at 803-04 (holding that in assessing whether a criminal activity is "otherwise extensive," unknowing participants in the scheme may be included as well, such as "salespeople who unknowingly conveyed fraudulent misrepresentations at a defendant's request" or "bank employees who facilitate the activities of a money launderer").

In addition to Danskoi, all the individuals just named constitute numerous other participants in the scheme, who are considered for the purpose of the "otherwise extensive" analysis regardless of whether they were knowing or unknowing participants. Further, Danskoi's

scheme was long-lasting, global, and was not limited just to asylum fraud. It involved far more than five others (whether knowing participants or not), each of whom were critical to the execution of the scheme. The involvement of these individuals render the criminal activity "otherwise extensive," and therefore the enhancement applies. *See, e.g.*, *Archer*, 671 F.3d at 166 ("we count as unknowing participants in the overarching conspiracy a fair number though probably not all of Archer's clients" in applying "otherwise extensive" enhancement); *United States v. Rubenstein*, 403 F.3d 93, 99 (2d Cir. 2005) (approving the "otherwise extensive" finding where the scheme involved two knowing participants and seven unknowing participants whose work was necessary to the scheme).

Presumably for similar reasons, Mosha readily stipulated that this same 4-level adjustment applied in his case, the Government agreed, the U.S. Probation Office agreed, and the Court did too in calculating Mosha's Guidelines range.

Accordingly, the Court should impose a four-level enhancement of the offense level pursuant to U.S.S.G. § 3B1.1(a).

**The Obstruction Enhancement Applies**

The Court should also impose a two-point obstruction enhancement, pursuant to Guidelines § 3C1.1, to account for Danskoi's attempt to obstruct or impede the administration of justice by perjuring himself at trial. The Guidelines allow for such an enhancement if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1. In order to impose the enhancement for false testimony at trial, "a sentencing court must find that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter." *United States v. Stewart*, 686 F.3d 156, 174 (2d Cir. 2012) (quoting *United States v. Zagari*, 111 F.3d 307, 329 (2d Cir. 1997)). "A witness testifying under oath or affirmation [commits perjury] if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Id*. (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)). The district court must find each of the elements to be present by a preponderance of the evidence. *See United States v. Salim*, 549 F.3d 67, 75 (2d Cir. 2008).

Among the lies Danskoi told to the jury, each established by a preponderance of the evidence and rejected by the jury, Danskoi falsely testified that (1) he believed that CS-3 was gay notwithstanding CS-3's clear and unequivocal statement that he was not; (2) he told CS-3 to wear an earring to his asylum interview to "relax" CS-3; (3) he believed that CS-3 was shy about his sexual orientation and his comments to CS-3 were intended to get CS-3 to open up about his sexual orientation and confide in Danskoi; (4) nobody besides CS-3 would write CS-3's asylum story or else Danskoi wouldn't be involved; and (5) he never did anything in response to Mosha's messages about visa fraud, when he in fact responded with detailed approving messages. While the Government need not rely on it at sentencing, Danskoi's testimony about Ostap Bender, who Danskoi brought up in his dealings with CS-3, is instructive background. Whereas CS-3 noted that Bender was presented "everywhere" as a "scammer," (Trial Tr. 161-62), and reputable publications confirm CS-3's assessment, *see* https://daily.jstor.org/the-red-sting-conmen-in-the-ussr/ (referring to Bender as a "conman"); https://www.cambridge.org/core/journals/slavic-

review/article/abs/world-of-ostap-bender-soviet-confidence-men-in-the-stalin-period/8AD7AFE873E1956936EA98D127C309B3 ("conman" or "confidence men"), Danskoi instead testified that he brought up Bender to refer to the presentation of additional country information at CS-3's asylum interview (Trial Tr. 1103).

In light of the above false testimony, the Government has established by a preponderance that Section 3C.1.1 applies. *See United States v. Stewart*, 686 F.3d at 174-78; *see also United States v. Bonds*, 933 F.2d 152, 155 (2d Cir. 1991); *United States v. Agostini*, 365 F. Supp. 2d 530, 536 (S.D.N.Y. 2005) ("The jury must have found Mr. Agostini's testimony to be false when it convicted Mr. Agostini of being a member of a narcotics conspiracy and of having assaulted Mr. Crowder."). Accordingly, the Court should apply a two-level obstruction enhancement.

## The Requested Sentence Is Warranted

**Legal Framework**

The Guidelines, while no longer mandatory, still provide strong guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005). A "district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," and that range "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). Although the Guidelines do not dictate a presumptively reasonable sentence, they are not merely a "body of casual advice." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted). The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita v. United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46. To the extent the Court imposes a sentence outside the range recommended by th Guidelines, the Court must "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Cavera*, 550 F.3d at 189 (quoting *Gall*, 552 U.S. at 46).

**Discussion**

Consideration of the factors set forth in 18 U.S.C. § 3553(a) militates in favor of a significant incarceratory sentence along the lines of the 21-month sentence recommended by the U.S. Probation Office but below the Guidelines Range of 27 to 33 months'. The nature and circumstances of the offense, the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment, warrant such a sentence. *See* 18 U.S.C. §§ 3553(a)(1), (a)(2)(A). Danskoi's criminal conduct was significant, contemplated, and sustained. He played a leadership role in a long-lasting conspiracy to defraud USCIS and obtain asylum and visas for individuals who did not deserve it. His conduct did not stop there. Rather than simply holding the Government to its burden, Danskoi took the stand at trial and perjured himself in an attempt to lie to a jury of his peers and avoid accountability for his actions. Even today, he still utterly fails to accept any responsibility for his crime.

Hon. J. Paul Oetken                                                                                                          Page 13
September 21, 2023

      The seriousness of Danskoi's conduct warrants imprisonment.  As the Court is well aware, the asylum system is designed to help the world's most vulnerable people—those who justifiably fear imprisonment, assault, torture, or death, simply because of factors they cannot control, such as their religion, nationality, ethnicity, political views, gender, or sexual orientation.  Danskoi, as the leader of Russian America with Mosha, along with his codefendants, cynically exploited that system by conspiring to trick USCIS officials into believing that clients who did *not* suffer or fear such inhumanities qualified for asylum.

      Further, Danskoi's immigration crimes were not limited to asylum fraud; he and Mosha discussed staging fake offices and lease agreements to help certain aliens obtain employment visas. Moreover, Danskoi was not simply a passive participant in the conspiracy.  To the contrary, he was a leader, with Mosha, of the operation.  While the Government lacks complete visibility into the scope of Danskoi's asylum and visa fraud conspiracy, the evidence makes clear that his conduct was not simply limited to CS-3 introduced by the investigating agents.  Among other things, he agreed in a 2016 message with Mosha to "sell" political asylum, and that is what Russian America did.  Before CS-3 presented any evidence that he had been (or would be) persecuted if he returned to Ukraine, Danskoi on his own volition suggested that CS-3 seek asylum based on political opinion ("Well, as I told you, in terms of price and quality, political asylum is, of course, the best option.").  (GX 105-T).  His words are revealing; he described political asylum as if it was a used car.  He helped fabricate false stories with CS-3 and coached him for the asylum interview.  He arranged the assistance of others to bolster the fraud, including a "journalist," a translator, and an attorney, all in order to support a fraudulent claim for asylum that was submitted under oath.

      Danskoi's conduct was not a momentary aberration, it was repeated and long-lasting, as the charged conspiracy spans multiple years. Over and over again, he took steps to commit fraud with and on behalf of CS-3, including, but not limited to: steering CS-3 toward pursuing asylum without any known legitimate basis; agreeing to prepare an asylum application that was false; coaching CS-3 how to write CS-3's fraudulent Asylum Affidavit and providing guidance about the Ayslum Interview; submitting the fraudulent Asylum Application; and connecting CS-3 with Lysyuchenko and Greenberg, all to further the unlawful conspiracy.

      And that was just CS-3.  As noted above, Danskoi discussed with Mosha selling political asylum and creating fake leases and staging fake places of employment to get clients visas.  Danskoi charged for his services, showing that his crime was financially motivated.

      In short, Danskoi made multiple decisions—across many meetings, spanning a considerable period of time—each of which displayed his willingness to commit and encourage fraud.

      Further, that Danskoi led an asylum fraud conspiracy after he had personally benefited from the asylum system, which allowed him to remain in the United States after his tourist visa expired, is an aggravating fact.

      Likewise, Danskoi's conduct was not completely victimless.  USCIS reports that immigration fraud, including asylum fraud, is endemic.  The overwhelming load of fraudulent applications creates a backlog and delays for those vulnerable applicants who truly deserve the relief asylum provides, and unfortunately causes USCIS to view each asylum application—

including for those who legitimately deserve such relief—with a more skeptical eye. The harms caused by asylum fraud are real. Fraudulent asylum applications undermine the integrity of the asylum process and make it more difficult to properly adjudicate the claims of legitimate asylum seekers. The immigration system depends upon the honesty of its participants. By coaching clients to lie to Asylum Officers (and, in so doing, trading in harmful stereotypes), Danskoi unmistakably undermined the public's faith in an already fragile immigration system, elevating the seriousness of this fraud.

For all of these reasons, Danskoi's conduct was serious, and a correspondingly significant sentence is warranted.

A significant incarceratory sentence is also necessary for general deterrence purposes, given how lucrative immigration fraud can be and how difficult it is to detect and prosecute without time-consuming audio recordings made during a law enforcement sting operation. Danskoi—an experienced immigration practitioner—knew that the immigration system was easy to exploit. He capitalized on his experience with the system to commit fraud.

One of the paramount factors that the Court must consider in imposing sentence under Section 3553(a) is the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). Courts have generally recognized that "white collar crime . . . requires heavy sentences to deter because it is potentially very lucrative." *United States v. Hauptman*, 111 F.3d 48, 52 (7th Cir. 1997); *see also Harmelin v. Michigan*, 501 U.S. 957, 988 (1991) (noting that "since deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties"). "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *Id.*; *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.").

As noted above, the asylum applicant pool is rife with fraud. The Government's investigation revealed that those in the immigration services industry have been following this case and a companion case involving a different immigration fraud conspiracy. The sentencing decision this Court makes will be similarly followed by those who represent and advise asylum applicants and prepare asylum applications and affidavits, including those who do so fraudulently. A significant sentence is necessary to send a clear message to those individuals who are currently committing, or contemplating committing such fraud: those who are caught gaming the immigration system—especially its leaders—will be brought to justice, held accountable, and receive meaningful punishments for it.

### A Significant Incarceratory Sentence Is Necessary to Avoid Unwarranted Sentencing Disparities

As this Court is aware, the same team of agents which investigated Danskoi and Russian America at the same time conducted a similar investigation into another Brooklyn-based firm engaged in asylum fraud on behalf of clients from Russia and the Commonwealth of Independent States, resulting in the convictions of three additional individuals, including two attorneys: Ilona Dzhamgarova and Arthur Arcadian. *United States v. Ilona Dzhamgarova et al.*, 21 Cr. 058 (MKV). The defendants have been sentenced to the following terms of imprisonment, with the following Sentencing Guidelines ranges, in descending order:

| Defendant | Guidelines Range | Sentence Imposed |
|---|---|---|
| Ilona Dzhamgarova | 33 to 41 months | 24 months |
| Uladzimir Danskoi | 27 to 33 months | TBD |
| Julia Greenberg | 21 to 27 months (adjusted range) | 3 months |
| Yury Mosha | 12 to 18 months | 10 months |
| Igor Reznik | 10 to 16 months | 10 months |
| Arthur Arcadian | 8 to 14 months | 6 months |
| Kateryna Lysyuchenko | 4 to 10 months | Time-served (over two months in pre-trial detention) |

Mosha is the closest comparator for Danskoi; they were partners and principals in the company with one leading the Brooklyn office and the other leading the Manhattan office. While Mosha may have been a savvier marketer of the business and may have kept a larger share of the profits during the early portion of the conspiracy, unlike Danskoi, Mosha accepted responsibility quickly, and did not proudly testify falsely in his own defense at trial. The Government respectfully submits that Mosha's sentence should serve as the absolute baseline to avoid an unwarranted sentencing disparity.

### Forfeiture

Based on the evidence submitted at trial, the Government also respectfully requests that the Court order forfeiture in the amount of $3,000.[5] As CS-3 testified, and as the transcripts of his audio-recorded conversations with Danskoi supported, he twice paid Danskoi $1,500 for the services he provided. (*See* GX 302 and 303, and accompanying testimony). CS-3 also committed to paying Danskoi an additional $2,000 but proof of that final payment was not documented at

---

[5] The Government will submit a proposed $3,000 forfeiture order at sentencing.

Hon. J. Paul Oetken  Page 16
September 21, 2023

trial. The evidence at trial thus establishes that Danskoi earned at least $3,000, if not more, in connection with the charged criminal conduct.

## **Conclusion**

For these reasons, the Government respectfully submits that a significant incarceratory sentence along the lines of the 21-month sentence recommended by the U.S. Probation Office but below the Guidelines Range of 27 to 33 months' is warranted.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for
the Southern District of New York

By:  /s/ David R. Felton
David R. Felton
Jonathan E. Rebold
Assistant United States Attorneys
(212) 637-2299 / -2512

cc: James M. Branden, Esq. (via ECF)